FILED

2020 MAR 20 AM 11: 09

MAUREEN G. KELLY
LAKE CO. CLERK OF COURT

## LAKE COUNTY COURT OF COMMON PLEAS
## CIVIL DIVISION

| | | |
|---|---|---|
| **ANDREA BRYNER** | : | **20CV000487** |
| **496 Cebarberry Ct.** | : | **VINCENT A. CULOTTA** |
| **Painseville, Ohio 44077** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **COMPLAINT** |
| **v.** | : | |
| | : | |
| **NVR, INC.** | : | **JURY DEMAND ENDORSED** |
| **d/b/a Ryan Homes** | : | **HEREON** |
| **c/o Corporation Service Company** | : | |
| **50 West Broad Street, Suite 1330** | : | |
| **Columbus, Ohio 43215** | : | |
| | : | |
| **Defendant.** | : | |

---

For her Complaint, Plaintiff Andrea Bryner ("Ms. Bryner" or "Plaintiff"), alleges and avers

the following against Defendant NVR, Inc. d/b/a Ryan Homes ("Ryan Homes" or "Defendant"),

and states as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Andrea Bryner is an individual residing at 496 Cebarberry Ct., Painseville,

Ohio 44077 in Lake County, Ohio.

2.      Defendant NVR, Inc. is a Virginia corporation with its principal place of business

located at 11700 Plaza America Drive, Suite 500, Reston, Virginia 20190.  NVR, Inc. does

business under the name Ryan Homes.

3.      Venue is proper in this Court pursuant to Civ.R. 3(B)(3) in that Defendant

3343828.3

EXHIBIT A

constructed Ms. Bryner's home in Lake County, Ohio.

4.     Jurisdiction is proper as the contract upon which this action is brought was entered into in Lake County, Ohio and the injuries sustained occurred in Lake County, Ohio.

## FACTUAL BACKGROUND

5.     Ms. Bryner reincorporates by reference all of the facts and allegations in each of the preceding paragraphs as if fully set forth herein.

### -- Ms. Bryner Contracts with Ryan Homes to Build Her New Home --

6.     On or about May 21, 2008, Ms. Bryner entered into a written purchase agreement with Ryan Homes for the purchase and construction of a residential home to be located at 496 Cebarberry Court in the Heisley Park subdivision in Painesville, Ohio (the "Home").  Pursuant to the terms of the contract, Ryan Home agreed to build the Home for the cost of $219,115.00.  A true and accurate copy of the purchase agreement is attached hereto as Exhibit A.

7.     The Home is a two-story, three bedroom, two and one-half bathroom residential home with approximately 2,024 square feet of livable space.  It sits on a roughly quarter-acre lot in the cul-de-sac of Cebarberry Court.  The Home has an unfinished basement area.

8.     Ms. Bryner has, at all times relevant, remained to sole owner and occupant of the Home.

### -- The Construction of the Home --

9.     According to the Application for Building Permit submitted to the City of Painesville on June 8, 2008 by the Defendant, Ryan Homes described itself as both the "Architect" and the "Engineer" for Ms. Bryner's home.  A true and accurate copy of the Building Permit is attached hereto as Exhibit B.  As such, Ms. Bryner was under the impression that Ryan Homes would follow all of the plans, terms of the purchase agreement, and regulations from the City of

2

Painesville and/or the State of Ohio.  Otherwise, she would not have entered into the agreement.

10.     During the pendency of construction, the City of Painesville issued a Plan Review specifically for the Home.  A true and accurate copy of the Plan Review, along with the corresponding reports as discussed below, is attached hereto as Exhibit C.

11.     The City approved the construction of the Home pursuant to a number of terms. Specifically, relevant here, being:

> a. **R404.1.7 Backfill Placement** – Backfill shall not be placed against the foundation wall until the wall has sufficient strength and has been anchored to the floor above, or has been sufficiently braced to prevent damage by backfill.
>
> b. **R405.1 Foundation Drainage** – Alternative approved foundation drainage systems shall be installed in accordance with their listing and approvals (ESR-1107)
>
> c. **R406.1&2 Foundation Waterproofing and Dampproofing** – In areas where a high water table or other sever soil conditions are known to exist, exterior foundation walls that retain earth and enclose habitable or usable spaces located below grade shall be waterproofed with a membrane extending from the top of the footing to the finished grade (NER-480 and 22-13)

12.     The ESR-1107 Report set the standards for the drainage foundation to be used, which approved the use of the Awkadrain system be used for the completion of the Home.  *(See* Ex. C-2).  Though not explicitly permitted in the report, Ryan Homes allegedly implemented a Form-A-Drain system as an alternative use of a footer drain system.

13.     The NER-480 Report and the 22-13 Report set the standards for the waterproofing to be used, which approved the use of Watchdog Waterproofing and Tuff-N-Dri Waterproofing for the completion of the Home.  (*See* Exhs. C-3 and C-4)

14.     Over the course of the months during construction, the City of Painseville had numerous inspection on the property.  Documentation from those inspections show that on each occasion, the drain tiles received a "FAIL/NOT" result.

15.     Upon information and belief, no soil samples were conducted at the site of the Home or for the plat the Home was constructed upon, making Ryan Homes unable to properly assess the depth required for placement of the drain footers.

16.     Upon information and belief, no geotech surveys were conducted at the site of the Home or for the plat the Home was constructed upon.

17.     The Home was not complete, or substantially complete, until on or around October 1, 2008, when the final inspection of the home occurred. Ms. Bryner moved in two days later, on October 3, 2008.  At that time, Ryan Homes did a maintenance review with Ms. Bryner in her home.  She was showed how to maintain the sump pump and drain the water tank.

**-- Ms. Bryner's Home Experiences Core, Structural Issues --**

18.     Despite all of these stringent regulations in place to protect the Home and others like it, upon information and belief, the plans were not properly followed.

19.     In April or May of 2018, Ms. Bryner began experiencing issues with dampness on the carpet in portions of her home.  She then began to contact individuals from Ryan Homes, Tremco Barrier Solutions (who was purportedly used as a subcontractor for Ryan Homes for the waterproofing of the foundation), and the City of Painesville to resolves her issues and get to the root of the problem.

20.     On or around June 27, 2018, Mr. Bryner contacted Drain Doctor to flush her footer drains.  It was at this time she discovered she did not have footer drains as advised by Drain Doctor; this is when Ms. Bryner first discovered, or reasonably could have discovered, the defects the Home that were the direct and proximate cause of her problems.

21.     As her problems continued to worsen, she contacted a professional service to evaluate the Home.  LJI Cement and Waterproofing, LLC ("LJI"), based in Kirtland, Ohio,

4

performed a preliminary inspection on her home and discovered serious issues with the Home's foundation.  The inspection included a camera inspection of the pipes connected to the sump pump. From that LJI recommended a small excavation occur to get a better understanding of the problems.

22.      On January 9, 2019, the excavation occurred, and LJI issued a report of its findings. A true and accurate copy is attached hereto as Exhibit D.

23.      As the report details, LJI discovered numerous issues, specifically that there were (1) no footer drains, (2) there was no piping to connect to the footer drains, (3) the waterproof coating was thinned out and transparent and labeled as "inferior", (4) there were no cleanouts (because there were not footer drains to tie to), and (5) there was no wash stone or limestone for drainage.

24.      LJI also concluded that the "foundation waterproofing and storm drainage system was not used as per the plans of the approved architectural drawings, The Ohio Building Code, Ohio Plumbing Code, International Building Code, and the Uniform Building Code."

25.      Moreover, LJI contended to Ms. Bryner that the sump pump was likewise suffering issues, and that *even if* the problems regarding the foundation did not exist, there would still be issues because the sump pump pipes were used of corrugated piping (not recognized since the 1970s) as opposed to PVC piping, and the pipes seem to "dead end" and are not properly connected as they should be.

26.      As part of its report and recommendation, LJI concluded to that a full excavation of the house would need to be done in order to appropriately waterproof the foundation.  An estimated cost was for $42,800.00.

27.      Upon information and belief, no footer drains were installed in the foundation of

Ms. Bryner's home in accordance with the approved plans for the Home or industry standards.  In the alternative, the Form-A-Drain system allegedly placed in the foundation of the Home was defective and/or improperly installed and/or Ryan Homes knew or reasonably should have known it was unsuitable for the land upon which the Home was built.

28.     Upon information and belief, no drain tiles were installed in the basement of Ms. Bryner's home in accordance with the approved plans for the Home or industry standards.  In the alternative, the Form-A-Drain system, which allegedly does not require use of drain tiles was defective and/or improperly installed and/or Ryan Homes knew or reasonably should have known it was unsuitable for the land upon which the Home was built.

29.     Upon information and belief, the Akwadrain system was not installed in the foundation of the Home in accordance with the approved plans for the Home or industry standards. In the alternative, the Akwadrain system was defective and/or improperly installed and/or Ryan Homes knew or reasonably should have known it was unsuitable for the land upon which the Home was built.

30.     Upon information and belief, the foundation of the Home was not properly waterproofed in accordance with industry standards and the plans of the Home.  In the alternative, the Watchdog Waterproofing and/or Tuff-N-Dri Waterproofing product allegedly used in the Home was defective and/or improperly installed and/or Ryan Homes knew or reasonably should have known it was unsuitable for the land upon which the Home was built.

31.     Upon information and belief, the sump pump was not properly installed in Ms. Bryner's home.  The pipes were not appropriately connected to the footer drain system, if one exists.  In the alternative, the sump pump and corresponding pipes were defective and/or improperly installed and/or Ryan Homes knew or reasonably should have known the system was

6

unsuitable for the Home.

32.     These failures by Ryan Homes were in direct contradiction to the established plans designed and approved as well as the terms of the purchase agreement.

33.     Because of this conduct, Ms. Bryner has experienced severe issues with her home. Particularly, there has been water/moisture accumulation in the basement.  And, there have been severe cracks in the foundation's interior and exterior. She would be, currently, unable to sell the Home in its present condition, and it has cost a depreciation in value.  Moreover, Ms. Bryner has had to go to great lengths to keep the damage at bay, requiring her to incur time and effort as well as emotional stress.

**-- Other Issues with the Heisley Park Neighborhood --**

34.     As discussed above, the Home is located in the Heisley Park subdivision.  Heisley Park is a single-family home community comprised of nearly 500 homes.  Upon information and belief, Ryan Homes has acted as the general contractor/builder for the entire subdivision and has continued to grow the subdivision up through 2017.

35.     There have been well-documented problems with the entire project since shortly before Ms. Bryner entered into the contract for the Home.

36.     Sometime in 2009, the City of Painesville recognized the ongoing problems with the Heisley Park subdivisions constructed by Ryan Homes.  After numerous issues, the City enacted a permanent regulatory scheme whereby Ryan Homes was required to conduct a hydrogeological study before any more construction could occur.  A hydrogeological study is a study of the subsurface hydrologic and geologic conditions in an area or location, which collects data about the type and thickness of the soil as well as the occurrence of ground water and how it flows.

7

37.     Upon information and belief, at least one other homeowner in the Heisley Park neighborhood has suffered the same or similar issues regarding the footer drains as Ms. Bryner has experienced.

## COUNT I – BREACH OF CONTRACT

38.     Ms. Bryner reincorporates by reference all of the facts and allegations in each of the preceding paragraphs as if fully set forth herein.

39.     Ms. Bryner and Defendant entered into a valid and enforceable contract for the purchase of the Home.

40.     Defendant breached that contract when it failed to construct and/or build the home according to the building plans and in conformity with industry standards.

41.     Defendant breached that contract when it failed to construct the Home in conformance with the requisite standards of care to perform in a workmanlike manner.

42.     As a direct and proximate result of the breach by Defendant, Ms. Bryner has sustained, and will continue to sustain, substantial damages for repair and replacement in an amount to be determined at trail, but in excess of $25,000.

## COUNT II – FRAUDULENT CONCEALMENT/FRAUD/INTENTIONAL MISREPRESENTATION

43.     Ms. Bryner reincorporates by reference all of the facts and allegations in each of the preceding paragraphs as if fully set forth herein.

44.     Defendant concealed from Ms. Bryner the fact that the Home was not built according to the drawn and accepted architectural and engineering plans.

45.     Defendant's actions, misrepresentations, and/or concealments were made falsely, with knowledge of their falsity, or with such utter disregard and recklessness as to whether they were true or false, that knowledge may be inferred.

8

46.     Defendant's knowingly-false representations and/or omissions were material to the transaction at hand.

47.     Ms. Bryner relied upon Defendant's misrepresentations and/or concealments, directly to Ms. Bryner's claimed damages.

48.     Defendant's actions, misrepresentations, and/or concealments directly induced Ms. Bryner into purchasing the Home.

49.     As a direct and proximate result of the actions, misrepresentations, and/or concealments by Defendant, Ms. Bryner has sustained, and will continue to sustain, substantial damages for repair and replacement in an amount to be determined at trail, but in excess of $25,000.

### COUNT III - NEGLIGENCE

50.     Ms. Bryner reincorporates by reference all of the facts and allegation in each of the preceding paragraphs as if fully set forth herein.

51.     Defendant owed a duty to Ms. Bryner to use ordinary skill in building the Home and/or hiring third parties to build the Home.

52.     While constructing the Home, Defendants breached their duty owed to Ms. Bryner.

53.     As a direct and proximate result of the negligence of Defendant, Ms. Bryner has sustained, and will continue to sustain, substantial damages for repair and replacement in an amount to be determined at trial, but in excess of $25,000.

### COUNT IV – FAILURE TO BUILD IN A WORKMANLIKE MANNER

54.     Ms. Bryner reincorporates by reference all of the facts and allegations in each of the preceding paragraphs as if fully set forth herein.

55.     Upon information and belief, Defendant failed to build the Home, specifically with

3343828.3

respect to the installation of footer drains, installation of drain tiles, protecting the foundation of the home with adequate waterproofing material, and installing a sump pump properly, among others, in a workmanlike manner using ordinary care and skill.

56.     Repairs of the defects will cost an amount in excess of $25,000.

57.     As a direct and proximate result of the Defendants failure to build in a workmanlike manner, Ms. Bryner has sustained, and will continue to sustain, substantial damages in an amount to be determined at trial, which amount exceeds $25,000.

## COUNT V – VIOLATION OF THE OHIO CONSUMER SALES PRACTICE ACT

58.     Ms. Bryner reincorporates by reference all of the facts and allegations in each of the preceding paragraphs as if fully set forth herein.

59.     Defendant violated the Ohio Consumer Sales Practices Act R.C. § 1345.01 *et seq.* by using unfair and deceptive trade practices in their consumer transaction with Ms. Bryner.

60.     At all times relevant, Ms. Bryner was a "consumer" as defined by § 1345.01(D).

61.     At all times relevant, Defendant was a "supplier" as defined by R.C. § 1345.01(C).

62.     Defendant materially misrepresented their professional abilities, and deceived Ms. Bryner into believing Defendant was competent to perform the work described in the contract.

63.     As a direct and proximate result of Defendant's unfair and deceptive trade practices, Ms. Bryner has sustained, and will continue to sustain, substantial damages in an amount to be determined at trial, which amount exceeds $25,000.

## COUNTY VI – DEFECTIVE DESIGN

64.     Ms. Bryner reincorporates by reference all of the facts and allegations in each of the preceding paragraphs as if fully set forth herein.

65.     Upon information and belief, the footer drain system (if one exists) in the home is

designed defectively.

66.     Upon information and belief, the drain tiles (if exist) in the Home are designed defectively.

67.     Upon information and belief, the Awkwadrain system (if one exists) is designed defectively.

68.     Upon information and belief, the waterproofing installed in the home is designed defectively.

69.     Upon information and belief, the sump pump installed in the home is designed defectively.

70.     Each causes, on its own or combined, an accumulation of water to build in Ms. Bryner's basement of the Home causing severe foundational cracks in both the interior and exterior of the Home, among other problems.

71.     As a direct and proximate result of each of these defective designs, Ms. Bryner has sustained, and will continue to sustain, substantial damages in an amount to be determined at trial, which amount exceeds $25,000.

## COUNT VII – DEFECTIVE INSTALLATION OR IMPLEMENTATION

72.     Ms. Bryner reincorporates by reference all of the facts and allegations in each of the preceding paragraphs as if fully set forth herein.

73.     Upon information and belief, the footer drain system (if one exists) in the Home was defectively installed or implemented.

74.     Upon information and belief, the drain tiles (if exist) in the home were defectively installed or implemented

75.     Upon information and belief, the Akwadrain system (if one exists) was defectively

11

installed or implemented

76. Upon information and belief, the waterproofing installed in the home was defectively installed or implemented

77. Upon information and belief, the sump pump installed in the home was defectively installed or implemented.

78. Defendant failed to adhere to the specification of each design when it installed each (if installation occurred), including, *inter alia*, failing to use proper pipes for the sump pump and/or adequately waterproofing the Home.

79. Each causes, on its own or combined, an accumulation of water to build in Ms. Bryner's basement of the Home causing severe foundational cracks in both the interior and exterior of the Home, among other issues.

80. As a direct and proximate result of Defendant's failure to adhere to the design of each of the systems noted above, Ms. Bryner has sustained, and will continue to sustain, substantial damages in an amount to be determined at trial, which amount exceeds $25,000.

## COUNT VIII – BREACH OF WARRANTY

81. Ms. Bryner reincorporates by reference all of the facts and allegations in each of the preceding paragraphs as if fully set forth herein.

82. The construction contract created an implied warranty that Defendant would build in a workmanlike manner.

83. Defendant failed to complete the Home in a workmanlike manner by failing to adhere to the plans and designs.

84. Defendant's failure to perform the work in a workmanlike manner constitutes a breach of warranty.

12

85.     As a direct and proximate result of Defendant's breach of warranty, Ms. Bryner has sustained, and will continue to sustain, substantial damages in an amount to be determined at trial, which amount exceeds $25,000.

### COUNT IX – *QUANTUM MERUIT*/SPECIFIC PERFORMANCE

86.     Ms. Bryner reincorporates by reference all of the facts and allegations in each of the preceding paragraphs as if fully set forth herein.

87.     Defendant failed to furnish construction services in accordance with its obligation under the contract.

88.     Ms. Bryner provided payment, as required, within her obligation under the contract.

89.     Defendant failed to properly perform is part of the agreement and was unjustly enriched by not furnishing construction services in accordance with its obligation despite Ms. Bryner providing full payment as required under the contract. The continued retention of payment despite no full furnishing the work would be inequitable.

90.     Defendant received the benefit of Ms. Bryner's payment without fully furnishing the construction services, all to the Defendant's unjust enrichment.

91.     As a direct and proximate result of Defendant's wrongful retention, Ms. Bryner has sustained, and will continue to sustain, substantial damages in an amount to be determined at trial, which amount exceeds $25,000.

**WHEREFORE**, Andrea Bryner prays for the following relief:

A.  Compensatory believed to be in excess of $25,000;

B.   Statutory treble damages;

C.  Punitive damages to the extent permitted by law;

D.  Specific performance of the contract;

3343828.3

E.  Pre-judgment and post-judgment interest;

F.  Attorney fees and costs;

G.  Such other legal and equitable relief as this Court deems appropriate.

Respectfully submitted,

Brian A. Muenchenbach (0088722)
Kaitlyn C. Meeks (0098949)
SEBALY SHILLITO + DYER
*A Legal Professional Association*
1900 Stratacache Tower
40 North Main Street
Dayton, Ohio 45423
Phone: 937-222-2500
Fax:    937-222-6554
bmuenchenbach@ssdlaw.com
kmeeks@ssdlaw.com

## JURY TRIAL DEMAND

Now comes the defendant, through counsel, and hereby demands a trial by jury.

Brian A. Muenchenbach

14

3343828.3

Lot **354**
Date of Purchase Agreement ____05/21/08____

Community ____Helsley Park PN____
Property Address ____496 CEDARBERRY COUR____, AINESVILLE, OH 44077

# OHIO PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (the "Agreement") is made as of the **21** day of ____May____, 20 **08**, by and between NVR, INC. t/a ____Ryan Homes____ ("Seller") and ____Andrea L Bryner____ (purchaser) and _____ (co-purchaser), presently residing at _____ 27780 Louise Drive ____Solon, OH 44139____ (telephone) ____440-312-2238____ (individually and collectively "Purchaser").

    1. **Consideration and Basis of Agreement.** In consideration of the mutual promises hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which Purchaser and Seller hereby acknowledge, Seller agrees to sell and convey and Purchaser agrees to purchase and receive, subject to the terms and conditions set forth below, (i) the land described as follows:

Lot # **354** , Section # _____, Subdivision ____Helsley Park PN____, County or City of ____Lake____, State of Ohio (the "Lot"), together with (ii) a home to be built on the Lot by Seller according to Seller's plan known as the ____INNSBRUCK____ Model, Set/Version # ____INN00-04____, including those options selected on the attached Master Selection Sheet (collectively, the "Property").

    (a) The home to be erected hereunder may not necessarily conform to the model home or model home area. Model homes, if any, and decorating items and other items in or about the model home and model home area are for display purposes only and are not included in the Purchase Price. Further, any advertising or promotional materials used or displayed by Seller are for display purposes only and are not the basis of the bargain between Seller and Purchaser.

    (b) Seller makes no representations with respect to Lot grades, Lot area, options, facades, home lay-outs, location of walks, driveways, personal property, fences, patios, decks, recreational facilities, landscaping, or any other representations whatsoever unless otherwise expressly provided herein.

    (c) Seller makes no representation with respect to the home type, size, style, price range or location of other homes to be built in this subdivision or in other subdivisions in the vicinity of the Property. Purchaser acknowledges that all site plans, generalized development plans, plats or renderings which may have been exhibited showing or indicating home types, the siting of homes on lots, grading or landscaping are projections only and are not binding upon Seller, and no representative of Seller is authorized to make any representation with regard to these items. In addition, Seller makes no representations as to the location of utility transformers and utility pedestals on the Property as the location of these facilities is determined solely by the utility companies and not the Seller.

    (d) Attached hereto and incorporated as part of this Agreement is a Master Selection Sheet which includes all options selected by Purchaser. Purchaser acknowledges and agrees that the Master Selection Sheet accurately reflects all options selected by Purchaser as of this date. Purchaser may request changes to the Master Selection Sheet and such requests for changes shall be approved or rejected at the sole discretion of the Seller. All requests for changes shall be processed pursuant to the Change Order Policy attached hereto and made a part hereof. The Purchase Price shall be increased or decreased as applicable to reflect all costs associated with any approved changes.

    (e) Purchaser acknowledges that Purchaser has reviewed some or all of the following: the home site, the home construction drawings (blueprints), the home site and grading plan, the record plat of subdivision (unless such plat has not been recorded as provided for by the Addendum attached hereto), elevation illustration, floor plan, and other plans related to the construction of the home on the Lot, together with the features described in Purchaser's timely delivered and approved selections shown on the Master Selection Sheet (as described in Subparagraph 1(d) above), and any approved Change Orders (also as described in Subparagraph 1(d) above) (collectively, the "Plans and Specifications"). Purchaser further acknowledges that the Plans and Specifications are the only agreed improvements to be sold with the Lot and as part of the Property under the terms of this Agreement. Purchaser unconditionally agrees that this Paragraph 1 defines Purchaser's complete expectation and is Purchaser's sole and exclusive basis of the bargain in regard to the improvements to be constructed by Seller on the Property. Purchaser further acknowledges that there are many accepted methods of calculating the square footage of structures. In its marketing brochures and documents, Seller may use different methods of calculating the square footage of the home and makes no representations as to the actual square footage of the home, regardless of the method utilized.

    2. **Sales Price and Payments.** Purchaser agrees to pay to Seller for the Property, including the options listed on the Master Selection Sheet, the sum of ____Two Hundred Eighteen Thousand One Hundred Fifteen Exactly____ Dollars ($____218,115.00 219,115____ (the "Purchase Price") payable as follows:

    (a) Cash earnest money deposit upon Purchaser's signing of this Agreement ............ $ ____1,000.00____
    (b) Non-refundable advance for specific selections made in the Master Selection Sheet ............ $ ____0.00____
    (c) An additional payment in cash due on or before ____6/21/08____ ............ $ ____8,000.00____
    (d) The balance in immediately available funds on the date of Settlement hereunder ............ $ ____209,115.00 219,115____

    The term "Deposit" shall mean all amounts due from Purchaser to Seller pursuant to paragraphs 2(a) and 2(c). Any checks accepted by Seller shall be subject to collection and payment. Any refunds or credits to Purchaser of the Deposit shall be without interest except as provided in Paragraph 13(b).

    3. **Mortgage Loan.** Within seven (7) days after Seller's execution of this Agreement, Purchaser, at Purchaser's expense, shall submit an application for a loan to a mortgage lender, reasonably acceptable to and approved by Seller (the "Lender"), in an amount equal to the Purchase Price less the Deposit less cash to be paid at Settlement. Purchaser agrees to diligently apply for, negotiate and attempt to obtain a mortgage loan approval from the Lender, in a form reasonably acceptable to Seller (the

OHMASTERSALE 080207
Print Date: 5/21/2008

Purchaser's Initials ____ Page 1

EXHIBIT A

Lot **354**

Date of Purchase Agreement _____05/21/08_____

Property Address _____496 CEDARBERRY COURT PAINESVILLE, OH 44077_____

Commun_____ Heisley Park PN

# OHIO PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** (the "Agreement") is made as of the _21_ day of _____May_____, 20 _08_, by and between NVR, INC. t/a _____Ryan Homes_____ ("Seller" and _____Andrea L Bryner_____ (purchaser) and _____ (co-purchaser), presently residing at _____ 27780 Louise Drive Solon, OH 44139_____ (telephone) _____440-312-2238_____ (individually and collectively "Purchaser").

**1. Consideration and Basis of Agreement.** In consideration of the mutual promises hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which Purchaser and Seller hereby acknowledge, Seller agrees to sell and convey and Purchaser agrees to purchase and receive, subject to the terms and conditions set forth below, (i) the land described as follows:

Lot # _**354**_, Section # _____, Subdivision _____Heisley Park PN_____, County or City of _____Lake_____, State of Ohio (the "Lot"), together with (ii) a home to be built on the Lot by Seller according to Seller's plan known as the _____INNSBRUCK_____ Model, Set/Version # _____INN00-04_____, including those options selected on the attached Master Selection Sheet (collectively, the "Property").

(a) The home to be erected hereunder may not necessarily conform to the model home or model home area. Model homes, if any, and decorating items and other items in or about the model home and model home area are for display purposes only and are not included in the Purchase Price. Further, any advertising or promotional materials used or displayed by Seller are for display purposes only and are not the basis of the bargain between Seller and Purchaser.

(b) Seller makes no representations with respect to Lot grades, Lot area, options, facades, home lay-outs, location of walks, driveways, personal property, fences, patios, decks, recreational facilities, landscaping, or any other representations whatsoever unless otherwise expressly provided herein.

(c) Seller makes no representation with respect to the home type, size, style, price range or location of other homes to be built in this subdivision or in other subdivisions in the vicinity of the Property. Purchaser acknowledges that all site plans, generalized development plans, plats or renderings which may have been exhibited showing or indicating home types, the siting of homes on lots, grading or landscaping are projections only and are not binding upon Seller, and no representative of Seller is authorized to make any representation with regard to these items. In addition, Seller makes no representations as to the location of utility transformers and utility pedestals on the Property as the location of these facilities is determined solely by the utility companies and not the Seller.

(d) Attached hereto and incorporated as part of this Agreement is a Master Selection Sheet which includes all options selected by Purchaser. Purchaser acknowledges and agrees that the Master Selection Sheet accurately reflects all options selected by Purchaser as of this date. Purchaser may request changes to the Master Selection Sheet and such requests for changes shall be approved or rejected at the sole discretion of the Seller. All requests for changes shall be processed pursuant to the Change Order Policy attached hereto and made a part hereof. The Purchase Price shall be increased or decreased as applicable to reflect all costs associated with any approved changes.

(e) Purchaser acknowledges that Purchaser has reviewed some or all of the following: the home site, the home construction drawings (blueprints), the home site and grading plan, the record plat of subdivision (unless such plat has not been recorded as provided for by the Addendum attached hereto), elevation illustration, floor plan, and other plans related to the construction of the home on the Lot, together with the features described in Purchaser's timely delivered and approved selections shown on the Master Selection Sheet (as described in Subparagraph 1(d) above), and any approved Change Orders (also as described in Subparagraph 1(d) above) (collectively, the "Plans and Specifications"). Purchaser further acknowledges that the Plans and Specifications are the only agreed improvements to be sold with the Lot and as part of the Property under the terms of this Agreement. Purchaser unconditionally agrees that this Paragraph 1 defines Purchaser's complete expectation and is Purchaser's sole and exclusive basis of the bargain in regard to the improvements to be constructed by Seller on the Property. Purchaser further acknowledges that there are many accepted methods of calculating the square footage of structures. In its marketing brochures and documents, Seller may use different methods of calculating the square footage of the home and makes no representations as to the actual square footage of the home, regardless of the method utilized.

**2. Sales Price and Payments.** Purchaser agrees to pay to Seller for the Property, including the options listed on the Master Selection Sheet, the sum of _____Two Hundred Eighteen Thousand One Hundred Fifteen Exactly_____ Dollars ($_____218,115.00_____) (the "Purchase Price") payable as follows:

| | | |
|---|---|---|
| signing of this Agreement | $ | 1,000.00 |
| ns made in the Master Selection Sheet | $ | 0.00 |
| re    6/21/08 | $ | 8,000.00 |
| (d) The balance in immediately available funds on the date of Settlement hereunder | $ | 209,115.00 |

The term "Deposit" shall mean all amounts due from Purchaser to Seller pursuant to paragraphs 2(a) and 2(c). Any checks accepted by Seller shall be subject to collection and payment. Any refunds or credits to Purchaser of the Deposit shall be without interest except as provided in Paragraph 13(b).

**3. Mortgage Loan.** Within seven (7) days after Seller's execution of this Agreement, Purchaser, at Purchaser's expense, shall submit an application for a loan to a mortgage lender, reasonably acceptable to and approved by Seller (the "Lender"), in an amount equal to the Purchase Price less the Deposit less cash to be paid at Settlement. Purchaser agrees to diligently apply for, negotiate and attempt in good faith to obtain a mortgage loan approval from the Lender, in a form reasonably acceptable to Seller (the

OHMASTERSALE 080207
Print Date: 5/21/2008

Purchaser's Initials _____

Page 1 of 12

"Loan Approval"). Purchaser a[u]...[z]es Seller to communicate with the Lender and disclo[...] [...]y information regarding this transaction in order to assist in the loan process. Purchaser shall be responsible for keeping Seller informed of the status of Purchaser's loan application. If Purchaser, in Seller's sole discretion, does not use good faith in attempting to procure a mortgage loan, Purchaser shall be in default of this Agreement and Seller may exercise any remedies it may have hereunder. If, within forty five (45) days from the date this Agreement has been signed by both Purchaser and Seller (the "Loan Approval Period"), Purchaser has not obtained a Loan Approval, Purchaser shall immediately notify Seller and Seller may, at its sole discretion, elect to terminate this Agreement by written notice to Purchaser. If the Loan Approval is not issued due, in Seller's sole judgment, to Purchaser's lack of good faith efforts to obtain the Loan Approval, Purchaser shall be in default and Seller may exercise any remedies it may have under this Agreement, including, but not limited to, retention of the Deposit as liquidated damages. If the Loan Approval is not issued in spite of Purchaser's good faith efforts, the Seller may terminate the Agreement and, in that event, Seller shall refund the Deposit expressly conditioned upon Purchaser's execution of a Mutual Release Agreement after which neither party shall have any further obligation or liability to the other. In the event Seller does not terminate the Agreement, Seller, at its option, may extend the Loan Approval Period for additional thirty (30) day periods during which time Purchaser shall continue to diligently seek financing in good faith. Purchaser shall continue to seek satisfaction of this financing contingency and Seller shall have the right, but not the obligation, to attempt to obtain for Purchaser a Loan Approval at prevailing market rates based upon the Purchaser's financial situation and creditworthiness. Purchaser shall cooperate with Seller and the Lender as may be necessary in order to effectuate the issuance of such Loan Approval and to close said loan, all at the sole expense of Purchaser. If Seller has extended the Loan Approval Period and upon the expiration of all such extended Loan Approval Periods a Loan Approval has still not been obtained despite Purchaser's continued good faith efforts, then this Agreement may be terminated at Seller's sole discretion. If Seller terminates this Agreement as provided herein, Seller shall refund the Deposit upon execution by Purchaser of a Mutual Release Agreement, after which neither party shall have any further obligation or liability to the other. In no event shall Seller have any liability to Purchaser whatsoever on account of any lender's refusal to approve Purchaser's loan application or to make the loan after issuance of a Loan Approval for any reason, other than the obligation of Seller to refund the Deposit to Purchaser if required by this Agreement.

After issuance and acceptance of the Loan Approval, Purchaser shall continue to work in good faith with the Lender to insure that the Loan Approval does not lapse or is not terminated. The Loan Approval shall not be modified by Purchaser without the prior written consent of the Seller. If the Loan Approval is revoked, lapses or is terminated by the Lender for reasons caused by Purchaser, Purchaser shall be in default of this Agreement and Seller shall have the right to exercise any remedies it may have under this Agreement, including, but not limited to, retention of the Deposit. Upon receipt by Purchaser of the Settlement Notice defined in paragraph 10, Purchaser shall not change Lender or make or agree to any changes to the terms of the Loan Approval which could affect or delay Settlement. If the Loan Approval is contingent on any conditions imposed by the Lender (including, but not limited to, the lease of an existing home, payoff of an existing mortgage, or payment of other debt obligations), the Purchaser is responsible for meeting all such conditions and in the event the Lender's contingency is not met for any reason, Purchaser shall be in default of this Agreement and Seller shall have the right to terminate the Agreement and exercise any remedies it may have including, but not limited to, retention of the Deposit. If the Loan Approval is terminated by the Lender in spite of Purchaser's good faith efforts, Seller shall terminate the Agreement and refund the Deposit paid upon Purchaser's execution of a Mutual Release Agreement after which neither party shall have any further obligation or liability to the other.

If the Lender requires preparation of a home location survey, Seller shall prepare such survey at Purchaser's expense, which survey shall not include staking of Lot boundaries.

4. **Limited Warranty.** Purchaser acknowledges that Purchaser has been afforded the opportunity to review Seller's limited warranty ("Limited Warranty") prior to execution of this Agreement, has received a copy of the Limited Warranty and agrees to accept the Limited Warranty as the sole warranty being given to Purchaser. THE LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF FREEDOM FROM STRUCTURAL DEFECTS, WORKMANSHIP, WORKMANLIKE CONSTRUCTION AND HABITABILITY, ALL OF WHICH PURCHASER HEREBY WAIVES.

5. **Right to Cure.** OHIO LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS FOR DEFECTIVE CONSTRUCTION AGAINST THE RESIDENTIAL CONTRACTOR WHO CONSTRUCTED YOUR HOME. AT LEAST SIXTY DAYS BEFORE YOU FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS, YOU MUST PROVIDE THE CONTRACTOR WITH A WRITTEN NOTICE OF THE CONDITIONS YOU ALLEGE ARE DEFECTIVE. UNDER CHAPTER 1312, OF THE OHIO REVISED CODE, THE CONTRACTOR HAS AN OPPORTUNITY TO OFFER TO REPAIR OR PAY FOR THE DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER THE CONTRACTOR MAKES. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER STATE LAW, AND FAILURE TO FOLLOW THEM MAY AFFECT YOUR ABILITY TO FILE A LAWSUIT OR COMMENCE ARBITRATION PROCEEDINGS.

6. **Preconditions to Construction.** Seller shall not be required to commence construction until receipt by Seller of:
(a) All cash payments as required in paragraph 2 above within the time provided.
(b) A written Loan Approval signed by Purchaser, as required within the time period indicated in paragraph 3 above.
(c) All selectable options, color selections and exterior selections.
(d) All necessary governmental approvals and permits.
In the event Seller elects to commence construction prior to the receipt of (a), (b) or (c) above, Purchaser shall in no way be relieved of its obligations hereunder.

7. **Completion of Construction.**
(a) In the event of delays resulting from causes beyond the Seller's reasonable control and occurring without its fault or negligence, including, without limitation, acts or defaults of Purchaser; acts or defaults of any developer, contractor, subcontractor or their employees; strike, lockout, or other labor trouble of any kind; delays caused by governmental controls or procedures, regulations, restrictions or moratoriums; governmental refusal to issue any necessary permits for construction on the Property; acts of suppliers of labor or material; delays or acts of utility service providers; adverse weather conditions; damage caused by fire, storm, earthquake, war, acts of terrorism or other casualty; or any form of act of God, the time for complete performance of this Agreement by Seller (to satisfy the Interstate Land Sales Full Disclosure Act ("ILSA"), as set forth in paragraph 10) and for Settlement (as defined in paragraph 10) shall be extended for a period of time equal to the length of the delay attributable to such cause, and Seller shall not be liable for damages for any such delay or failure to perform. In the event of a moratorium which is in place for ninety (90) days or longer, Seller shall have the option of terminating this Agreement and refunding the Deposit paid to Purchaser upon execution by Purchaser of a Mutual Release Agreement after which the parties shall have no further obligations or rights under this Agreement.

(b) In the event that the \_\_\_\_arty shall be Substantially Complete on the Settlement da\_\_\_\_ .tlement shall be completed as provided in paragraph 10 of this Agreement. Substantially Complete shall be defined as the issuance by the local jurisdiction of a temporary or conditional certificate of occupancy or other document permitting residential use ("Residential Use Permit") even if such items as landscaping, exterior concrete (including, but not limited to, footings needed for deck construction), driveways, final grading, exterior painting, and other minor punch-list items may not be completed. Purchaser agrees to sign and deliver any waiver or other document that may be required by the local jurisdiction in order to, obtain a Residential Use Permit prior to completion of the above listed items. Seller agrees that any such uncompleted items shall be completed as soon as practicable, weather conditions permitting. Seller further reserves the right to enter onto the Property after Settlement to complete such exterior items without the prior approval of Purchaser.

(c) Purchaser and Seller shall inspect the Property prior to Settlement ("Pre-Settlement Demonstration") and shall note, on the Pre-Settlement Demonstration Report provided by Seller, those items which, in Seller's sole discretion, require completion or corrective action pursuant to this Agreement. Seller shall undertake to complete all such items prior to Settlement; however, Settlement shall not be delayed, nor shall funds be held in escrow, if such work is not completed before Settlement. To the extent any such items remain to be completed after Settlement, Seller shall have the right to enter upon the Property to complete those items that remain to be completed in the interior of the home. Purchaser shall cooperate with Seller in providing access to the interior of the home.

(d) Purchaser shall have the right to schedule a private home inspection ("Inspection") of the Property by an independent private home inspector at Purchaser's sole expense, not less than 48 hours prior to the Pre-Settlement Demonstration. The Inspection must be performed by a full member in good standing of a national home inspection association in accordance with the ethical standards and code of conduct or practice of that association. Any home inspector must have insurance coverage acceptable to Seller prior to entering the Property. Purchaser unconditionally indemnifies, defends and holds harmless Seller from any injury to person or property occurring as the direct or proximate result of the Inspection. If Purchaser elects to hire an independent private home inspector, Seller shall reasonably cooperate in scheduling an Inspection; however, the Inspection must be scheduled with no less than 48 hours advance notice to Seller and the Inspection must take place during normal construction working hours. The Inspection must be coordinated with the Seller's representatives in accordance with their schedules and shall in no way interfere with construction or delay the construction schedule. Any deficiencies identified by the Inspection shall be promptly submitted to Seller in writing along with a certified report by the home inspector. In the event any deficiency identified by the Inspection is not in compliance with local codes or acceptable construction practices as defined in Seller's Limited Warranty, Seller shall correct such deficiency in a timely manner and the correction of any such deficiency shall not delay Settlement unless the deficiency is of such a nature as to make the Property uninhabitable. Seller reserves the right to evaluate and address any alleged deficiency in accordance with the standards, terms and conditions of the Limited Warranty.

(e) Seller shall have the right to enter upon the Property at any time after Settlement for the purpose of making exterior changes to the Lot or to adjacent lots and improvements thereon, including but not limited to grading and drainage system changes and the removal or planting of trees.

(f) In the event Seller, in its sole discretion, encounters, upon excavation or installation of footings and foundation, any unusual or difficult ground conditions on the Lot, Seller may notify Purchaser and offer to Purchaser one or more or the following options: (i) choosing an alternative site from among those offered by Seller, if one is available; (ii) signing a Mutual Release Agreement and receiving a refund of the Deposit previously paid by Purchaser, thereby terminating this Agreement and relieving both Seller and Purchaser of their respective obligations hereunder; or (iii) agreeing with Seller upon an increase in the Purchase Price reflective of the Lot conditions and proceeding with performance under this Agreement.

(g) Except as set forth in subsection (c) and (d) of this paragraph 7, Purchaser or Purchaser's agent or representative may not have access or entry to the Property or the construction site during construction, nor may Purchaser store any possessions in or about the Property or the construction site prior to Settlement and delivery of possession to the Purchaser. Any violation of this provision may, at the election of Seller, be considered a default of this Agreement and, in addition to any other remedies available to Seller, Seller may terminate this Agreement and, in such event, the Deposit and any other amounts paid toward the Purchase Price, including amounts paid under paragraph 2(b) of this Agreement, may be retained by Seller as fixed and liquidated damages. Further, should Purchaser violate this provision, Purchaser will be deemed to be trespassing and Seller assumes no liability or responsibility for any injuries suffered by Purchaser while on the Property or construction site, and Purchaser indemnifies Seller from any and all injury, cost, loss or damage arising therefrom.

**8. Seller's Changes.**

(a) Seller shall have the right to substitute similar materials of substantially equivalent quality, in Seller's sole discretion.

(b) Seller reserves the right to make changes in the plans and specifications, for the purposes of mechanical installations, building code and site requirements, and reasonable architectural design improvements subsequent to the date of this Agreement.

(c) The location and ground elevation of the home on the Lot and the necessity, if any, to reverse the plan of the home to conform to the existing contours, are determined by Seller, in its sole discretion.

(d) Subject to any architectural guidelines applicable to the subdivision or stated in the homeowner's association documents, Seller reserves the right to refine, revise or change the housing types to be sold in any subdivision. Purchaser acknowledges that the siting of the homes in specific locations within a subdivision is subject to change, however any resitings shall conform to all applicable zoning and community boundary and set-back requirements.

(e) Purchaser acknowledges that the timing of construction, location, existence, size and features of tot lots, trails, community entry features and monuments, and recreational facilities within the community (collectively the "Facilities"), if any, are subject to change. No representations as to the timing, location, size or features of such Facilities are part of this Agreement.

**9. Adjacent Land Uses.** Seller makes no representations as to the proposed or approved uses for land adjacent to the Property or the subdivision which contains the Property. Governmental regulations and policy affecting the Property and adjacent land uses are subject to change and are beyond the control of the Seller. For more information regarding these issues, Purchaser should contact the appropriate Government Agencies. Seller is under no obligation to provide Purchaser with copies of the preliminary or final site plans, the record plat, blueprints, general plan maps or other planning documents which may affect the planning and development of the surrounding area. Copies of such documents can be obtained at the appropriate county or city planning office. Seller warrants that the Property is in compliance with the applicable zoning regulations. Purchaser acknowledges that Seller has made no representation other than those contained in this Agreement as to current or proposed zoning of any land, and that no agent of Seller is authorized to do so.

**10. Settlement and Delivery.** Settlement shall be held at a place selected by Seller at which time, upon payment in full of the Purchase Price set forth in paragraph 2 hereof, Seller shall execute and deliver a general warranty deed to the Purchaser conveying the Property and possession of the Property shall be delivered to Purchaser ("Settlement"). Settlement is estimated to occur on or

about _____10/01/2008_____ (the "Estimated Settlement Date"). The Estimated Settlement Date provided merely as a rough guideline and is subject to change. Seller shall determine a specific date and time when Settlement shall actually occur (the "Actual Settlement Date") at an earlier or later date, based upon the actual construction schedule of the subdivision and the Property. In no event shall Seller be considered in breach of this Agreement or liable for any damages whatsoever for any difference in time between the Estimated Settlement Date and the Actual Settlement Date. Not less than ten (10) days in advance, Seller shall provide written notice to Purchaser of the Actual Settlement Date and location of Settlement (the "Settlement Notice"). If the Actual Settlement Date is changed by Seller and Seller shall provide subsequent written or oral notice to reschedule the Actual Settlement Date no less than two (2) days prior to the rescheduled Actual Settlement Date. Notwithstanding anything to the contrary in this Agreement (save and except Paragraph 7(a)), complete performance of this Agreement by Seller and Purchaser is required within two (2) years from the date of execution of this Agreement (the "Outside Delivery Date"). This provision shall obligate Seller to construct and complete Settlement on the Property within that two (2) year period. Provided Purchaser is not in breach, and notwithstanding any contrary terms of this Agreement, Purchaser's remedies for Seller's breach of this Paragraph shall include, but only to the limited extent required to satisfy the minimum requirements necessary to exempt this Agreement from the provisions of ILSA, as defined in Paragraph 7(a), those remedies available under applicable local law. For the purposes of this Paragraph, the date of execution of this Agreement shall be the later of the date this Agreement is signed by Purchaser and Seller. Performance of this Agreement by Purchaser and Seller shall be deemed complete upon Settlement on the Property, subject only to provisions of this Agreement which, by their express written terms, survive the delivery of the deed of conveyance at Settlement. If Seller's performance under this Agreement is delayed or performance of this Agreement is not completed within said two (2) year period due to Purchaser's breach of any term or condition of this Agreement, Seller shall be entitled to the remedies set forth in Paragraph 13(a). Purchaser covenants and agrees that upon the request of Seller at any time and from time to time during the term of this Agreement, Purchaser will furnish Seller with a written statement, duly executed by Purchaser, that Purchaser: (i) remains fully bound to successfully perform all of its obligations under this Agreement, (ii) intends to fully perform all of Purchaser's obligations under this Agreement and to make full Settlement in accordance with the terms hereof, and (iii) knows of no circumstance which has occurred or which, with the passage of time may occur, that would in any way impair Purchaser's ability to fully perform Purchaser's obligations hereunder. The failure of Purchaser to deliver the aforesaid written statement to Seller within five (5) days of request therefor shall constitute a breach by Purchaser of one of Purchaser's obligations under this Agreement and Seller shall immediately be entitled to the remedies set forth in Paragraph 13(a). Purchaser further acknowledges and agrees that if at any time Purchaser notifies Seller of its intention not to fully perform its obligations under this Agreement or to make full Settlement in accordance with the terms hereof, such notice shall automatically constitute a breach by Purchaser of one of Purchaser's obligations under this Agreement and Seller shall immediately be entitled to the remedies set forth in Paragraph 13(a).

**11. Payment of Closing Costs and Mortgage Discount Points.**

(a) Purchaser voluntarily agrees that Purchaser shall pay all Closing Costs associated with Settlement, including all recordation taxes and any state or local transfer taxes, except as otherwise provided in paragraph 11(d) below. All claims and alleged entitlements to the contrary are hereby waived by Purchaser and Seller is fully released in regards to same. For purposes of this Agreement, Closing Costs are defined as all costs associated with Settlement including, but not limited to, mortgage discount points, escrow and pro rata items such as tax proration and tax escrows, fire insurance premiums, mortgage insurance premiums, mortgage interest, title examination, survey and lender fees, state and local transfer and recordation taxes and stamps, title insurance binder costs and policy premiums, costs of document preparation, attorneys' fees, settlement fees, notary fees and messenger fees.

(b) General real estate taxes and special assessments shall be prorated as of Settlement based on the most recent tax bill. If no split figures are available, no proration shall be made. Purchaser hereby agrees to assume and be solely responsible for payment of all taxes and assessments that are not yet due and payable as of the date of Settlement and Seller shall not be required to reimburse or credit Purchaser for any such taxes or assessments. All prorations made at Settlement shall be final and conclusive on the parties and no adjustments shall be made post-Settlement for any increases in taxes or assessments or as a result of any other changes in the tax bill, whether prospective or retroactive. Purchaser should contact the local governmental taxing authority for additional information concerning real estate taxes and assessments in connection with the Property.

(c) All utility charges, including, without limitation, sewer and water benefit charges and other public dues, and charges are to be adjusted to the date of Settlement and thereafter assumed by Purchaser. Purchaser shall have all utility services to the Property transferred into Purchaser's name, such transfer to be effective no later than the Actual Settlement Date.

(d) Purchaser has been advised that Seller has an affiliation with NVR Mortgage Finance, Inc. and that Purchaser has the right to obtain mortgage financing from any lender Purchaser chooses. As an incentive to encourage Purchaser to utilize NVR Mortgage Finance, Inc. for mortgage financing, Seller is willing to provide Purchaser with either a discount against the Purchase Price enumerated in Paragraph 2 hereof ("Non-Cash Discount"), or provide Purchaser with a discount against cash due at Settlement, including financing and other Closing Costs ("Cash Discount"), or some combination thereof (collectively, the "Incentives").

Should Purchaser select NVR Mortgage Finance, Inc. for mortgage financing, Seller shall provide the following Incentives:

(i) Non-Cash Discount: $~~15,700.00~~   25,700.00 , to be applied as shown on the Master Selection Sheet, the effect of which is a dollar per dollar reduction to the Purchase Price contained in Paragraph 2 hereof;

(ii) Cash Discount: $_____774_____ towards Closing Costs including mortgage discount points, filing fees, or other financing-related cash payment due from Purchaser, as permitted by applicable law; and

(iii) The amount of the Cash Discount shown in (ii) above shall not exceed the actual amount of mortgage discount points and/or Closing Costs required to be paid by Purchaser at Settlement. It is the intent of this provision that there shall be no cash payment to Purchaser at Settlement. Notwithstanding the foregoing, in the event Purchaser is obtaining a VA guaranteed or FHA insured loan, any amount set forth in (ii) above shall be reduced by an amount equal to any Closing Costs that are required by the Lender to be paid by Seller. Similarly, any amount set forth in (ii) above shall be reduced by an amount equal to any Closing Costs that are required by State law or regulation to be paid by Seller. Additionally, the amount of the Non-Cash Discount shall not exceed the value/cost of the applicable construction options or Lot premiums specified in (i) above.

(e) In the event Purchaser elects to use a mortgage lender other than NVR Mortgage Finance, Inc., Seller's Incentives listed in paragraph 11(d) above shall be eliminated. This shall not affect or alter Seller's obligations with regard to such portion of Closing Costs otherwise required to be paid by Seller in connection with VA guaranteed or FHA insured loans or by any other State statute or regulation. In addition, Purchaser's election to use a mortgage lender other than NVR Mortgage Finance, Inc. shall not delay settlement.

OHMASTERSALE 080207
Print Date: 5/21/2008

Purchaser's Initials: _____

Page 4 of 12

about ____10/01/2008____ (the Estimated Settlement Date"). The Estimated Settlement Date provided merely as a rough guideline and is subject to change. Seller shall determine a specific date and time when Settlement shall actually occur (the "Actual Settlement Date") at an earlier or later date, based upon the actual construction schedule of the subdivision and the Property. In no event shall Seller be considered in breach of this Agreement or liable for any damages whatsoever for any difference in time between the Estimated Settlement Date and the Actual Settlement Date. Not less than ten (10) days in advance, Seller shall provide written notice to Purchaser of the Actual Settlement Date and location of Settlement (the "Settlement Notice"). If the Actual Settlement Date is changed by Seller then Seller shall provide subsequent written or oral notice to reschedule the Actual Settlement Date no less than two (2) days prior to the rescheduled Actual Settlement Date. Notwithstanding anything to the contrary in this Agreement (save and except Paragraph 7(a)), complete performance of this Agreement by Seller and Purchaser is required within two (2) years from the date of execution of this Agreement (the "Outside Delivery Date"). This provision shall obligate Seller to construct and complete Settlement on the Property within that two (2) year period. Provided Purchaser is not in breach, and notwithstanding any contrary terms of this Agreement, Purchaser's remedies for Seller's breach of this Paragraph shall include, but only to the limited extent required to satisfy the minimum requirements necessary to exempt this Agreement from the provisions of ILSA, as defined in Paragraph 7(a), those remedies available under applicable local law. For the purposes of this Paragraph, the date of execution of this Agreement shall be the later of the date this Agreement is signed by Purchaser and Seller. Performance of this Agreement by Purchaser and Seller shall be deemed complete upon Settlement on the Property, subject only to provisions of this Agreement which, by their express written terms, survive the delivery of the deed of conveyance at Settlement. If Seller's performance under this Agreement is delayed or performance of this Agreement is not completed within said two (2) year period due to Purchaser's breach of any term or condition of this Agreement, Seller shall be entitled to the remedies set forth in Paragraph 13(a). Purchaser covenants and agrees that upon the request of Seller at any time and from time to time during the term of this Agreement, Purchaser will furnish Seller with a written statement, duly executed by Purchaser, that Purchaser: (i) remains fully bound to successfully perform all of its obligations under this Agreement, (ii) intends to fully perform all of Purchaser's obligations under this Agreement and to make full Settlement in accordance with the terms hereof, and (iii) knows of no circumstance which has occurred or which, with the passage of time may occur, that would in any way impair Purchaser's ability to fully perform Purchaser's obligations hereunder. The failure of Purchaser to deliver the aforesaid written statement to Seller within five (5) days of request therefor shall constitute a breach by Purchaser of one of Purchaser's obligations under this Agreement and Seller shall immediately be entitled to the remedies set forth in Paragraph 13(a). Purchaser further acknowledges and agrees that if at any time Purchaser notifies Seller of its intention not to fully perform its obligations under this Agreement or to make full Settlement in accordance with the terms hereof, such notice shall automatically constitute a breach by Purchaser of one of Purchaser's obligations under this Agreement and Seller shall immediately be entitled to the remedies set forth in Paragraph 13(a).

11. **Payment of Closing Costs and Mortgage Discount Points.**

(a) Purchaser voluntarily agrees that Purchaser shall pay all Closing Costs associated with Settlement, including all recordation taxes and any state or local transfer taxes, except as otherwise provided in paragraph 11(d) below. All claims and alleged entitlements to the contrary are hereby waived by Purchaser and Seller is fully released in regards to same. For purposes of this Agreement, Closing Costs are defined as all costs associated with Settlement including, but not limited to, mortgage discount points, escrow and pro rata items such as tax proration and tax escrows, fire insurance premiums, mortgage insurance premiums, mortgage interest, title examination, survey and lender fees, state and local transfer and recordation taxes and stamps, title insurance binder costs and policy premiums, costs of document preparation, attorneys' fees, settlement fees, notary fees and messenger fees.

(b) General real estate taxes and special assessments shall be prorated as of Settlement based on the most recent tax bill. If no split figures are available, no proration shall be made. Purchaser hereby agrees to assume and be solely responsible for payment of all taxes and assessments that are not yet due and payable as of the date of Settlement and Seller shall not be required to reimburse or credit Purchaser for any such taxes or assessments. All prorations made at Settlement shall be final and conclusive on the parties and no adjustments shall be made post-Settlement for any increases in taxes or assessments or as a result of any other changes in the tax bill, whether prospective or retroactive. Purchaser should contact the local governmental taxing authority for additional information concerning real estate taxes and assessments in connection with the Property.

(c) All utility charges, including, without limitation, sewer and water benefit charges and other public dues, and charges are to be adjusted to the date of Settlement and thereafter assumed by Purchaser. Purchaser shall have all utility services to the Property transferred into Purchaser's name, such transfer to be effective no later than the Actual Settlement Date.

(d) Purchaser has been advised that Seller has an affiliation with NVR Mortgage Finance, Inc. and that Purchaser has the right to obtain mortgage financing from any lender Purchaser chooses. As an incentive to encourage Purchaser to utilize NVR Mortgage Finance, Inc. for mortgage financing, Seller is willing to provide Purchaser with either a discount against the Purchase Price enumerated in Paragraph 2 hereof ("Non-Cash Discount"), or provide Purchaser with a discount against cash due at Settlement, including financing and other Closing Costs ("Cash Discount"), or some combination thereof (collectively, the "Incentives").

Should Purchaser select NVR Mortgage Finance, Inc. for mortgage financing, Seller will provide the following Incentives:

(i) Non-Cash Discount: $19,700.00 _____ , to be [illegible] effect of which is a dollar per dollar reduction to the Purchase Price [illegible]

(ii) Cash Discount: $_____ towards Closing [illegible] es, or other financing-related cash payment due from Purchaser [illegible]

(iii) The amount of the Cash Discount shown in (ii) above shall not exceed the actual amount of mortgage discount points and/or Closing Costs required to be paid by Purchaser at Settlement. It is the intent of this provision that there shall be no cash payment to Purchaser at Settlement. Notwithstanding the foregoing, in the event Purchaser is obtaining a VA guaranteed or FHA insured loan, any amount set forth in (ii) above shall be reduced by an amount equal to any Closing Costs that are required by the Lender to be paid by Seller. Similarly, any amount set forth in (ii) above shall be reduced by an amount equal to any Closing Costs that are required by State law or regulation to be paid by Seller. Additionally, the amount of the Non-Cash Discount shall not exceed the value/cost of the applicable construction options or Lot premiums specified in (i) above.

(e) In the event Purchaser elects to use a mortgage lender other than NVR Mortgage Finance, Inc., Seller's Incentives listed in paragraph 11(d) above shall be eliminated. This shall not affect or alter Seller's obligations with regard to such portion of Closing Costs otherwise required to be paid by Seller in connection with VA guaranteed or FHA insured loans or by any other State statute or regulation. In addition, Purchaser's election to use a mortgage lender other than NVR Mortgage Finance, Inc. shall not delay settlement.

_354_ Block _____     (              |        Community ____ PK

# CHANGE ORDER ADDENDUM TO PURCHASE AGREEMENT

tendum made this _29_ day of _May_, 20 _08_ to a Purchase Agreement by and between NVR, Inc. t/a
_Ryan Homes_ ("Seller") and _Andrea L. Bryne_ and _____ (collectively,
Purchaser"), dated _5-21-08_ (the "Agreement").

the undersigned Purchaser and Seller hereby agree to the following:
The Agreement is hereby amended to include the changes to the Property specified below:

| Add/<br>dele | Code | Description | Charge |
|---|---|---|---|
| A | 336XX02 | Carpet house upgrade #2 | $ 1950 |
| A | 336XX05 | Carpet yard upgrade #1 | 250 |
| A | 336CB04 | Carpet yard upgrade #1 basement | 100 |
| D | 8LC | Elevation C | (2550) |
| A | ELA | Elevation A | 0 |
| D | ELC/EVM | partial brick veneer front | (3450) |
| A | ELA/EVA | Brick Veneer front | 4550 |
| A | CAM8XMM | Vanity raised panel owner's bathroom whitebay | 150 |
| A | 287XK05 | Kitchen cabinets upgrade #3- Square | 2250 |
| A | see/SKD | 9' ceilings 1st floor w/ 42" wall cabinets | 2650 |
| | | Total | $ 5900 |

The changes above result in an ☒ increase ☐ Decrease of $ _5900_ to the Purchase Price. The Purchase
rice is hereby changed from $ _228,965_ to $ _234,865_. Purchaser is responsible for any
additional cash required at Settlement as a result of the above changes.

] The Deposit is hereby increased to $ _____, of which $ _____ is non-refundable

] The Non-cash Discount, as defined in the Agreement, is hereby ☐ Increased ☐ Decreased by $ _____ which
sults in a change from $ _____ to $ _____

] The Cash Discount, as defined in the Agreement, is hereby ☐ Increased ☐ Decreased by $ _____ which
sults in a change from $ _____ to $ _____

Purchaser understands that the above changes may require revisions to the blueprints or other modifications to the home in order to
accommodate the changes and Purchaser hereby accepts these required revisions and/or modifications.

All other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

This Addendum, upon execution by both parties, is herewith made an integral part of the aforementioned Agreement.

PURCHASER:

DATE _5-21-08_        _Andrea L. Bryne_

DATE _____

SELLER:
NVR, Inc. t/a _Ryan Homes_

DATE _____     By: _____
                              Vice President

a IC ONTRACTORS TO BE NOTIFIED:

_____

_____

☐ Construction has started.

MHBR NO. 56
Updated 08/14/08

Entered UCS by: _____
Date: _5/30_
Sent Lumber: Yes/No

Added By: _____  Date: _6/10_
subcontractors to Notify:
☐ Electrician  ☐ Electric Supplier  ☐ Plumber  ☐ Flooring
☐ Garage Doors  ☐ Insulation  ☐ HVAC  ☐ Siding
☐ Fireplace  ☐ Shelving/Tub Doors  ☐ Painter  ☐ _____
☐ Attachment B  ☐ Acknowledgement  ☐ Copy Field  ☐ Field Modify

354 Block _____     (

Community _____ Y(

## CHANGE ORDER ADDENDUM TO PURCHASE AGREEMENT

Addendum made this 24 day of May 20 08 to a Purchase Agreement by and between NVR, Inc. t/a
Ryan Homes ("Seller") and Andrea J. Bryner and _____ (collectively,
"Purchaser"), dated 5/21/08 (the "Agreement").

The undersigned Purchaser and Seller hereby agree to the following:
The Agreement is hereby amended to include the changes to the Property specified below:

| Add/Dele | Code | Description | Charge |
|---|---|---|---|
| Add | aPC | powder room | $ 3,050 |
| Add | P2C | Elev C | 2,550 |
| Add | FaC/EVM1 | partial brick veneer front | 3,450 |
| Del | F2A | Elev A | < 0 |
| Add | aQ2 | recessed lights finished bsmt | 300 |
| Add | MBO | drywall garage | 0 |
| Add | aQD | fireplace recessed lights | 250 |
| Add | aQH | floodlights double | 250 |
| | | | |
| | | | |
| | | Total $ | 9850 |

The changes above result in an ☐ Increase ☑ Decrease of $ 9850 to the Purchase Price. The Purchase
Price is hereby changed from $ 349,290,115 to $ 328,965 . Purchaser is responsible for any
additional cash required at Settlement as a result of the above changes.

☐ The Deposit is hereby increased to $ _____ , of which $ _____ is non-refundable.

☐ The Non-cash Discount, as defined in the Agreement, is hereby ☐ Increased ☐ Decreased by $ _____ which
results in a change from $ _____ to $ _____ .

☐ The Cash Discount, as defined in the Agreement, is hereby ☐ Increased ☐ Decreased by $ _____ which
results in a change from $ _____ to $ _____ .

Purchaser understands that the above changes may require revisions to the blueprints or other modifications to the home in order to
accommodate the changes and Purchaser hereby accepts those required revisions and/or modifications.

All other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

This Addendum, upon execution by both parties, is herewith made an integral part of the aforementioned Agreement.

PURCHASER:

DATE 5-24-08          _Andrea J Bryner_

DATE _____

SELLER:
NVR, Inc. t/a Ryan Homes

DATE _____ 6/3/          By: _____
                              Vice President

SUBCONTRACTORS TO BE NOTIFIED:

_____

_____

☐ Construction has started.

MHBR NO. 56
Updated 01/14/08

Entered UCS by: _____
Date: _____
Sent Lumber: Yes No

| Notified By: _____ Date: _____ |
| Subcontractors to Notify: |
| ☐ Electrician ☐ Electric Supplier ☐ Plumber ☐ Flooring |
| ☐ Garage Doors ☐ Insulation ☐ HVAC ☐ Siding |
| ☐ Fireplace ☐ Shelving/Tub Doors ☐ Painter ☐ |
| ☐ Attachment B ☐ Acknowledgement ☐ Copy Field ☐ Field Modify |

(f) Local jurisdictions ty ..ly assess residential property owners for the cost of public ..rovements such as roads, water and sewer. Many times, the information regarding the assessments is not known until after the improvements are constructed and the local jurisdiction has a certification from the engineer and contractors of the total costs expended on the improvements. This amount is then assessed against all of the homeowners who benefit from the improvements. These assessments are typically included as part of the property tax bill. Since these improvements, from planning through to completion, typically take years, additional houses which benefit from the improvements may be approved and/or built, or, alternatively, some planned projects may never come to fruition. This would affect the amount of the assessment since it is based upon the number of properties benefiting from the improvements. Seller makes no representations or warranties regarding any assessments which affect the Property, either now or in the future. Purchaser is urged to obtain information from the local jurisdiction regarding public improvements that are planned or under construction for this area and information on potential and/or estimated assessments. Seller shall have no liability whatsoever in regards to any information pertaining to assessments, including any information, whether fact-based or conjecture, provided by employees of the Seller.

**12. Title.**

(a) At Settlement, title to the Property shall be good and marketable, fully insurable by a reputable American Land Title Association (ALTA) title insurance company subject, however, to (i) easements, covenants, conditions and restrictions of record, (ii) any statutory lien for ad valorem taxes which are not yet levied, published, due or payable, (iii) any homeowner's association documents restricting the use and enjoyment of the Property, (iv) zoning and other applicable laws and regulations, and (v) such facts as an accurate survey and personal inspection of the Property would reflect, provided same do not render title uninsurable. The Property is not subject to any ground rent. If title cannot be delivered at Settlement in compliance with this paragraph and upon receipt of written notice by Purchaser, Seller may, but is not obligated to, determine that any title defects are of such character that they may readily be remedied by legal action. In the event Seller determines that such legal steps are a reasonable means to perfect title to the Property, such actions, if Seller elects to undertake same, must be taken promptly by Seller at Seller's sole expense, in which case the time herein specified for Settlement will be extended for the period of time necessary for such action. If Seller cannot perfect title or is unable to perfect title after taking reasonable legal actions, Seller shall promptly notify Purchaser in writing and Purchaser shall have the right, at Purchaser's option, to either (i) terminate this Agreement by written notice to Seller within ten (10) days after receipt of Seller's notice, or (ii) waive any title defects and proceed to Settlement. Purchaser shall be deemed to have accepted title at the time Settlement occurs and Seller shall be expressly released from all liability or damages by reason of any defect in or failure of title. If Purchaser terminates the Agreement for title defects, Seller shall refund the Deposit upon Purchaser's execution of a Mutual Release Agreement, after which neither party shall have any further obligation or liability to the other. This subparagraph shall not survive Settlement.

(b) The Property is sold subject to easements, if any, created or to be created, prior to or after Settlement for the installation of utilities, stormwater management or drainage facilities, street lights and/or additional covenants, encumbrances, restrictions or easements which may be placed on record by the Seller, or the developer of the Property, before or after execution of this Agreement for the benefit of the Property and/or the community of which it is a part without the consent of Purchaser and for no additional consideration (monetary or otherwise). If such easements are required after Settlement, Purchaser agrees to cooperate with Seller, for no additional consideration (monetary or otherwise) in executing and delivering any and all documents related to such easements when and as requested. After Settlement, Purchaser grants Seller, or its designees, the right to enter upon the Lot and permission to perform all site work Seller may be required to perform by local governmental authorities or the homeowners association, for no additional consideration (monetary or otherwise).

(c) Purchaser is purchasing a completed dwelling from Seller and Seller is not acting as a contractor for Purchaser in the construction of the home. Purchaser shall acquire no right, title or interest in Property or the dwelling except the right and obligation to purchase the completed home in accordance with the terms of this Agreement. Equitable title shall remain vested in Seller until delivery of the deed at Settlement.

**13. Default.**

(a) Default-Purchaser. If the Purchaser shall fail to make full and timely Settlement hereunder or shall otherwise be in breach or default of any provision under this Agreement, the Purchaser acknowledges, understands and agrees that the damages that will or may be suffered by the Seller as a result of such breach or default by the Purchaser are uncertain and not reasonably calculable with mathematical certainty. Accordingly, the Seller reserves the right to retain the Deposit as liquidated damages and not as a penalty, in which event Purchaser and Seller shall be relieved from further liability hereunder. In the alternative, Seller may retain the Deposit for the payment of damages and pursue such legal and/or equitable remedies the Seller may have on account of Purchaser's breach or default, including, but not limited to, specific performance. In the event Purchaser fails to take title to the Property on the Actual Settlement Date as required in this Agreement, Seller may, in its sole discretion, agree to extend the time of Settlement. In the event Purchaser does not settle on the Actual Settlement Date, regardless of whether or not Seller has agreed to extend the time of Settlement, Purchaser shall pay a late settlement charge computed at the rate of 1-1/2% of the unpaid balance of the Purchase Price per month. The full monthly amount of the late charge shall be assessed on the day after Settlement was to have occurred and shall be assessed every thirty (30) days thereafter and shall be paid in full on the date that Settlement actually occurs. However, this late settlement charge shall not be construed as a waiver on the part of Seller of any of Seller's rights hereunder or of any legal or equitable remedies Seller may have in seeking enforcement of this Agreement and/or the recovery of Seller's damages. No interest rate charged herein shall be in excess of that permitted by law. The parties constituting Purchaser shall be jointly and severally liable hereunder. In the event that Purchaser breaches or defaults under this Agreement, Purchaser shall be responsible for all attorneys' fees incurred by Seller in enforcing this Agreement.

(b) Default-Seller. Default by Seller shall be deemed to have occurred (provided Purchaser is not in default) upon Seller's failure (1) to complete Settlement as required so to do hereunder; or (2) to perform the obligations required to be performed by Seller hereunder prior to Settlement. In the event that Seller defaults under this Agreement as defined in the immediately preceding sentence, and provided Purchaser is not in default, Purchaser's sole and exclusive remedy shall be to recover a sum equal to the Deposit (as defined in paragraph 2 and to the extent previously paid to Seller) and accrued interest at the legal rate since the date of Seller's breach plus the sum of One Thousand Dollars ($1,000.00) as liquidated damages and not a penalty (which sum, the parties agree, is a reasonable forecast of actual damages, which cannot at present be ascertained with certainty), in return for which Purchaser and Seller shall be automatically deemed mutually released in regard to the Agreement and the Property and this Agreement (except that release) shall be null and void. In the event that the foregoing limitation of Purchaser's remedies (as specifically described in the second sentence of this Subparagraph) is finally determined by a court of competent jurisdiction to be unenforceable, Purchaser's sole remedy in the event of a pre-Settlement default by Seller under (1) and (2) above shall be limited to the right to recover the greater of (A) the Deposit (to the extent previously paid to Seller) together with accrued interest thereon at the legal rate or (B) actual damages suffered by Purchaser as a result of such pre-Settlement default by Seller (as hereafter defined), in return for which Purchaser and Seller shall be automatically deemed mutually released in regard to the Agreement and the Property and this Agreement (except that release) shall

be null and void. For purposes \_\_\_\_.n, the term "actual damages" shall mean the difference \_\_\_\_ en the fair market value of the Property on the estimated date of completion under Subparagraph 7(a) of this Agreement and the Purchase Price, including options. TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, PURCHASER EXPRESSLY WAIVES THE RIGHT TO SUE FOR SPECIFIC PERFORMANCE OF THIS AGREEMENT AS WELL AS ANY CLAIMED RIGHT TO ASSERT OR FILE A LIS PENDENS AGAINST THE PROPERTY AND FURTHER COVENANTS NOT TO DO EITHER UNDER ANY CIRCUMSTANCES. Purchaser agrees that the liquidated damages provision set forth above is sufficient consideration for Purchaser's waiver of the right to sue for specific performance. Notwithstanding the foregoing remedy limitations applicable to a pre-Settlement default by Seller under (1) and (2) above, all of Purchaser's rights to sue Seller for default or breach of this Agreement shall merge with the deed and Purchaser's sole and exclusive remedy for any post-Settlement Seller default under the portions of this Agreement that survive Settlement under this Agreement (if any), shall be limited to the lesser of (i) the cost to perform or (ii) the diminution in the Property value caused by any such default, and Seller's alleged default in performance shall be judged exclusively by the written performance standards defined in the Seller's Limited Warranty. All other remedies following Settlement (if any) are hereby waived and released by Purchaser.

14. **Claims and Disputes.** PURCHASER AND SELLER COVENANT AND AGREE THAT ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY CLAIMS BASED IN WHOLE OR IN PART ON FACTS OCCURRING BEFORE SETTLEMENT, WHETHER KNOWN OR UNKNOWN, AND THAT ARISE OUT OF OR RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, SETTLEMENT HEREUNDER, THE AGREED IMPROVEMENTS TO THE PROPERTY (WHETHER AS-BUILT OR AS-PROMISED) AND/OR THE HEREIN DESCRIBED REAL ESTATE, REGARDLESS OF LEGAL THEORY AND REGARDLESS OF THE NAMED RESPONDENT(S)/DEFENDANT(S) ("CLAIMS"), SHALL BE GOVERNED BY A ONE (1) YEAR LIMITATION OF ACTION PERIOD AND BAR DATE RUNNING FROM THE DATE THE CLAIM OR CAUSE OF ACTION ACCRUES (IF AT ALL). CONSISTENT WITH THE FOREGOING, ALL SUCH CLAIMS BASED ON MATTERS OCCURING BEFORE THE SETTLEMENT DATE SHALL BE DEEMED TO HAVE ARISEN AND ACCRUED, IF AT ALL, AND THE AFORESAID ONE YEAR LIMITATION OF ACTION PERIOD FOR ALL SUCH CLAIMS SHALL BEGIN TO RUN NOT LATER THAN THE SETTLEMENT DATE. WITH THE SOLE EXCEPTION OF COUNTERCLAIMS, ANY SUCH CLAIMS INITIATED IN ANY FORUM AGAINST ANY PARTY TO THIS AGREEMENT AND/OR THEIR JOINT AND SEVERAL SUCCESSORS, MEMBERS, AFFILIATES, EMPLOYEES, AGENTS, CONTRACTORS AND/OR SUPPLIERS BY ANY OTHER PARTY TO THIS AGREEMENT AND/OR THEIR SUCCESSORS, SUBROGEES AND ASSIGNS SHALL BE DEEMED AUTOMATICALLY BARRED AND PRECLUDED AS A MATTER OF LAW AND CONTRACT IF NOT FILED/INITIATED WITHIN THAT AGREED ONE (1) YEAR LIMITATION OF ACTION PERIOD FOLLOWING SETTLEMENT AND BEFORE SAID BAR DATE. ALL APPLICATION OF THE SO-CALLED "DISCOVERY RULE" IS MUTUALLY WAIVED BY THE PARTIES. BY EXECUTING THIS AGREEMENT, PURCHASER ACKNOWLEDGES PURCHASER'S UNDERSTANDING AND AGREEMENT TO THESE TERMS AND THAT THE SAID ONE (1) YEAR PERIOD IS COMPLETELY REASONABLE IN ALL RESPECTS. NOTWITHSTANDING THE FOREGOING, THESE BAR DATE TERMS SHALL NOT APPLY TO CLAIMS FOR INDEMNITY AND/OR CONTRIBUTION BY SELLER AGAINST PURCHASER AND/OR ANY OTHER PERSON. THESE RIGHTS MAY ONLY BE ENFORCED BY PURCHASER AND SELLER AND NOTHING HEREIN SHALL BE CONSTRUED TO CREATE ANY THIRD PARTY BENEFICIARY RIGHTS IN ANY OTHER PERSON OR ENTITY.

15. **No Contingencies.** Unless otherwise provided by addendum attached hereto this Agreement in no way is contingent upon the sale, rental, settlement or other disposition of any other property owned by Purchaser.

16. **Naturally Occurring Gases, Arsenic and Other Metals.** A small percentage of homes in the United States experience elevated levels of radon gas and/or methane gas or other naturally occurring gases. These are naturally occurring gases which rise up and escape from the soil. In addition, the U.S. Geological Survey has shown that elevated levels of arsenic have been found throughout the State of Ohio. These phenomena can occur in any home, regardless of the type of home or who builds it.

The Seller claims no expertise in the measurement or reduction of either the gases in homes or arsenic or other elemental metals which may exist in the ground, nor does Seller provide any advice to homeowners as to acceptable levels or possible health hazards of gases, arsenic or other elemental metals. As to radon, homeowners may wish to obtain a test kit that meets the EPA protocol for measuring the level of radon gas in their homes. EPA publishes a list which provides information on EPA-approved suppliers of such test kits.

Purchaser agrees that this Agreement is not conditioned upon testing results for naturally occurring gases, arsenic, or other elemental metals, or the presence or lack of gases, arsenic or other elemental metals affecting the Property. Upon Settlement, Purchaser shall be deemed to have accepted the Property as to the presence of gases and/or arsenic and/or other elemental metals now or in the future and Seller shall be released from any and all claims related to or arising from the presence of any naturally occurring gases, arsenic or other elemental metals.

Purchasers seeking further information should contact the U.S. Environmental Protection Agency or their state environmental protection office.

17. **Energy Efficiency and Possible Biological Impurities.**

(a) Modern homes, including the Property, are built tightly to slow the escape of warm air in the winter and the escape of cool air in the summer. These tight construction techniques also help reduce the entrance into the home of certain naturally-occurring, organic, often airborne, and often invisible contaminants such as (without limitation) animal dander, dust, dust mites, fungi, all forms of mold, bacteria and pollen (collectively, "Biological Impurities"). However, Biological Impurities brought into the home (through the natural circulation of air, generated by or carried into the home by or upon people, animals or things, including building materials) can become trapped and actively grow in the tightly constructed home unless they are affirmatively removed. Moisture, either from leaks or from exposure to the elements during the construction process or after occupancy by the Purchaser, can lead to an addition in those Biological Impurities in the home. For instance, as an example of the foregoing and without limitation, moisture from leaks into the interior of the house and the resulting wood rot (to the extent such leaks and wood rot would not be covered by Seller's Limited Warranty), either alone or in combination with certain variables such as the temperature and the type of cellulose wood products, can cause the development of mold and other Biological Impurities to develop.

(b) Within the home, Biological Impurities can cause allergies or other more serious health effects for the occupants. According to some experts, Biological Impurities cannot be completely eliminated or excluded from residential construction such as the Property. Notwithstanding the immediately preceding sentence, it is Purchaser's sole responsibility after Settlement to implement periodic, careful inspections and maintenance procedures in an effort to minimize the existence and effect of Biological Impurities

within the Property. The Seller d[...] ot claim any expertise regarding the identification, remedia[...] possible health consequences of Biological Impurities; if Purchaser would like more information, Purchaser should contact the U.S. Environmental Protection Agency, state or local authorities.

(c)  The Seller has not made, created or invited (nor does it intend to make, create or invite) any warranty or any other expectancy, either express or implied, with respect to any Biological Impurities.  Purchaser agrees for themselves that Seller, its subcontractors and suppliers, shall not be liable for any damages (whether direct or consequential) or for any injury (including, but not limited to, any personal injury) to Purchaser, regardless of legal theory (including, but not limited to, Seller's negligence) arising out of or relating to any real or alleged Biological Impurities located in or at the Property.  Accordingly, Purchaser releases Seller, its subcontractors and suppliers, and any and all other persons and entities of and from any and all present and future claims, damages and causes of action, regardless of legal theory, that arise out of or in any way relate to the real or alleged presence of Biological Impurities in or at the Property (collectively, "Biological Impurities Claims").  To the maximum extent permitted by law, Purchaser hereby waives (and is estopped to assert) all claims to the contrary.  Purchaser further acknowledges that nothing to the contrary has been promised by Seller or otherwise made any part of the basis of the bargain between the parties in regards to this transaction and, upon request, Purchaser shall sign a separate confirmatory addendum and reaffirmation at Settlement to further memorialize that this Paragraph accurately states and shall remain the mutual intent of the parties.  Purchaser hereby expressly covenants and agrees to pay to and indemnify Seller and its subcontractors and suppliers, for any and all damages and/or costs (including, without limitation, attorney's fees and court costs) incurred by Seller and/or its subcontractors and/or its suppliers as a result of any Biological Impurities Claims made, or attempted to be made, by Purchaser.  In addition, the deed of the Property to be delivered by Seller to Purchaser at Settlement may contain a covenant running with the land and binding upon the Property which sets forth the waiver, release and indemnification provisions contained herein.  Purchaser agrees to take title to the Property subject to this covenant which shall be binding upon Purchaser.  This provision shall survive Settlement and shall not merge with or into the deed of conveyance.

18.  Oral Statements or Promises.  Unless oral statements or promises are written into this Agreement, they are not enforceable under law.  By including the terms below, the Purchaser and Seller are making them part of this Agreement and agree to abide by these terms.  THIS SECTION SHOULD NOT BE LEFT BLANK IF YOU ARE RELYING ON ANY ORAL STATEMENTS OR PROMISES.  The following oral statements or promises have been made by the Seller, the Seller's agent or the Purchaser.  Performance of each of these statements or promises is incorporated into each party's obligation to fully perform the terms of this Agreement:

None Given

_____

_____

_____

19.  Insulation.  The type, size and R value of insulation to be installed in your new home shall be at least as shown on the chart below.  R means resistance to heat flow; the higher the R value, the greater the insulation power.

| LOCATION | R-VALUE* | TYPE** |
|---|---|---|
| Basement Slab · W/O Only | R-5 | 2' V or H Rigid Foam |
| Foundation Walls S.F.D. | R-11 | 3½" Fiberglass Batt |
| Exterior Walls | R-13 | 3½" Fiberglass Batt |
| Walls Adjacent to Unfin. Space | R-11 | 3½" Fiberglass Batt |
| Garage Common Walls | R-13 | 3½" Fiberglass Batt |
| Floors at Overhangs (10" Frame) | R-30 | 9½" Fiberglass Batt |
| Floors at Overhangs (8" Frame) | R-19 | 6½" Fiberglass Batt |
| Floors over Garages (10" Frame) | R-30 | 9½" Fiberglass Batt |
| Floors over Garages (8" Frame) | R-19 | 6½" Fiberglass Batt |
| Attics (flat) | R-30 | 12½" Blown Fiberglass or 8.11" Blown Stabilized Cellulose |
| Attics (cathedral) | R-30 | 9½" Fiberglass Batt |

*     This is a minimum rating; the R value may be higher if required by local jurisdictions.
**    Thickness of fiberglass insulation provided is based on U.S. Greenfiber, LLC Cocoon2 Stabilized Cellulose Insulation. Thickness may vary from manufacturer to manufacturer; however the R value will remain the same.

20.  Community/School Information.  Seller includes certain information in its marketing, advertising, promotional and sales documents regarding the community for informational purposes only and such information is given to the best of Seller's knowledge as of the date the information is given.  Seller makes no warranties as to the accuracy or timeliness of this information and Purchaser acknowledges that such information is subject to change, that Purchaser is not relying upon such information in entering into this Agreement, and none of such information is a part of this Agreement.  School district and boundary information may be obtained by contacting the appropriate County or City School Board.

21.  Subordination.  Purchaser agrees that its rights under this Agreement are and shall be subordinate to those of Seller's construction lender for this Property, and Purchaser further agrees that this Agreement is and shall be subordinate to any lien placed on the Property by Seller's construction lender.

22.  Successors and Assigns.  This Agreement shall be binding on the parties and their heirs, legal representatives and permitted assigns.  This Agreement cannot be assigned by Purchaser without the prior written consent of the Seller, which may be withheld at Seller's sole discretion.

23.  Risk of Loss.  Seller assumes the risk of loss or damage to the Property by fire or other casualty until Settlement.  If such loss or damage occurs, Seller may terminate this Agreement and refund the Deposit to Purchaser without further liability to Purchaser.  Purchaser shall have no right to or interest in fire or other casualty or hazard insurance proceeds.

24.  Time of the Essence.  TIME IS OF THE ESSENCE FOR THIS AGREEMENT.  This means that the failure to do what is required within the timeframes specified in this Agreement is a default under the Agreement.

OHMASTERSALE 080207
Print Date: 5/21/2008

Purchaser's Initials _____

Page 7 of 12

25. **Picture Release.** P[ ]ser hereby gives Seller, its successors and assigns, full per[ ]n to use, publish, and copyright photographic prints and any other reproductions of the Property, or any part thereof, for advertising, publicity, and for any and all bona fide commercial purposes whatsoever.

26. **Miscellaneous.** All notices and communications under this Agreement shall be in writing, except as otherwise provided herein, and shall be deemed duly given on the date such notice is (i) mailed by U.S. postal service regular mail or certified mail, first class postage prepaid, (ii) delivered by an overnight courier by next day delivery, (iii) sent by facsimile or electronic mail with transmission verification, or (iv) by personal delivery, if to Seller to the applicable Vice President's office, and if to Purchaser to his address given above. The parties shall be responsible for notifying each other of any change of address. This Agreement (including any notices thereof) shall not be recorded. The invalidity of any provision of this Agreement shall not affect the validity or enforceability of any other provision set forth herein. Where the context requires, words in the singular shall be substituted for the plural and vice versa, and words in the masculine shall be substituted by any gender. This Agreement, its formation and enforceability shall be governed by the laws of the State of Ohio without regard for conflicts of law principles. Any rules of interpretation wherein this Agreement is construed against its drafter are waived.

27. **Entire Agreement.** This Agreement and the following listed documents are incorporated by reference and constitute the entire and final Agreement. No other prior or contemporaneous agreements, representations, promises or terms (written or oral) are part of this Agreement, but are superseded by this written Agreement. No additions or changes to this Agreement shall be valid or binding unless signed by an authorized officer of Seller and Purchaser.

Ohio Addendum to Purchase Agreement _____ _____

Affiliated Business Arrangement Disclosure _____ _____

Master Selection Sheet _____ _____

Change Order Policy _____ _____

_____ _____

28. **Merger.** The parties hereby agree that the mutual intent of the undersigned Purchaser and Seller is that (except as specifically provided in this Agreement) all of Purchaser's rights and remedies under the Agreement shall merge with (and shall be completely extinguished and superseded by) the deed delivered to Purchaser at Settlement. The sole and only exceptions to that intended and agreed merger are those rights and remedies (if any) which are expressly defined in (a) the deed, and (b) the Limited Warranty to be issued from Seller to the Purchaser at Settlement. Purchaser hereby voluntarily and expressly waives and releases all contrary claims and entitlements. Purchaser agrees to execute any documentation reasonably required at Settlement to further memorialize the intent of the parties stated in this Paragraph 28 and that Purchaser's rights and remedies post-Settlement shall be limited to items (a) and (b) herein. Unless otherwise expressly stated in the Agreement, all of the Purchaser's obligations under the Agreement and all of the Seller's rights and remedies under the Agreement, including but not limited to, paragraphs 1(a)-(c), 1(e), 2, 4, 5, 7(b)-(e), 8-10, 11(b), 11(f), 12(b), 13(b), 14, 16, 17, 18, 25, 27, and 28 as well as all Addenda, shall survive and shall not be merged into the deed delivered at Settlement.

29. THIS IS A LEGALLY BINDING CONTRACT. READ AND UNDERSTAND ALL PROVISIONS PRIOR TO SIGNING. IF NOT UNDERSTOOD SEEK LEGAL OR OTHER COMPETENT ADVICE. IF PURCHASER SIGNS BELOW, IT SHALL BE CONCLUSIVELY PRESUMED THAT PURCHASER HAS FULLY READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT. PURCHASER ACKNOWLEDGES THAT THIS AGREEMENT, AS SIGNED BY PURCHASER ALONE, CONSTITUTES AN OFFER TO PURCHASE AND THAT THIS AGREEMENT SHALL NOT BE BINDING UPON SELLER UNTIL EXECUTED BY A VICE PRESIDENT OF SELLER. THE SALESPERSON OR REPRESENTATIVE RECOMMENDING APPROVAL IS NOT SUCH A VICE PRESIDENT. PURCHASER'S OFFER SHALL BE REVOCABLE ONLY BY WRITTEN NOTICE OF REVOCATION GIVEN TO AND RECEIVED BY SELLER'S APPLICABLE VICE PRESIDENT PRIOR TO ACCEPTANCE BY SELLER. SELLER IS NOT REQUIRED TO PROVIDE NOTICE OF ITS ACCEPTANCE TO PURCHASER AND ACCEPTANCE OCCURS UPON SIGNATURE BY SELLER'S VICE PRESIDENT.

Date: 5/21/08

PURCHASER:

Date: _____

SELLER:
NVR, INC. t/a \_\_\_\_Ryan Homes\_\_\_\_

Date: 6/3/8

By: _____
Vice President

Lot _354_
Property Address _____ 496 CEBARBERRY COURT PAINESVILLE OH 44077 _____  Community _____ Helsley Park PN _____

# OHIO ADDENDUM TO PURCHASE AGREEMENT

Addendum made this _21_ day of _____ May _____ , 20_08_ to a Purchase Agreement by and between NVR, Inc. t/a _____ Ryan Homes _____ ("Seller") and _____ Andrea L Bryner _____ and _____ (collectively, "Purchaser"), dated _____ 05/21/08 _____ (the "Agreement").

Below are a series of addenda which, if checked in the left margin by Seller and initialed by Purchaser, are made a part of the Agreement as of the date below.

## [X] HOMEOWNERS ASSOCIATION ADDENDUM

Purchaser acknowledges that the Property is part of the _____ Helsley Park _____ Homeowners Association and that Purchaser has received the following Homeowners Association documents:
- Declaration of covenants, conditions, restrictions and easements including amendments (if applicable)
- Bylaws of Association (if applicable)
- Public Offering Statement (if applicable)
- Operating Budget (if applicable)
- Other: _____

Purchaser acknowledges that they shall be obligated to pay a one time initial capital account assessment contribution, collected at Settlement, in the amount of $ _____ 250.00 _____ and an estimated annual assessment of $ _____ 250.00 _____, which is estimated to be payable in the amount of $ _____ 250.00 _____ per _____ year _____, made payable to _____ Helsley Park HOA _____.

_Purchaser's Initials_

## [X] LANDSCAPE ADDENDUM

Purchaser shall be responsible, at Purchaser's sole cost and expense, for fully landscaping the Lot in accordance with the Homeowners Association guidelines (if applicable) within three (3) months after Settlement or as soon weather will permit. If any Homeowners Association restriction or covenant is more restrictive than this Addendum, then the Homeowners Association restriction shall prevail.

_Purchaser's Initials_

## [X] STORM WATER MANAGEMENT ADDENDUM

The Ohio Environmental Protection Agency ("OEPA") requires certain notifications from property owners regarding storm water management for new construction. Seller has notified OEPA that construction is taking place on the Property which will affect storm water management. OEPA requires a Notice of Termination to be filed upon completion of the installation of the lawn on the front, side and rear yards of the Property. Because Purchaser is responsible for the installation of the lawn, Purchaser shall be responsible for notifying OEPA upon completion of installation of the lawn and hereby agrees to file a Notice of Termination with OEPA upon such completion. For further information regarding compliance with the OEPA requirements, Purchaser may contact the OEPA – Division of Surface Water at P.O. Box 1049, Columbus, Ohio, 43215. Purchaser also acknowledges that they have been informed of and have reviewed the storm water management plan for the Property. Purchaser is responsible for the maintenance and care of the storm water management area on the Property and acknowledges that this area cannot be altered pursuant to restrictions and regulations of the city or township, the Ohio Department of Environmental Resources and the Ohio Department of Natural Resources.

_Purchaser's Initials_

## [ ] COMMON DRIVEWAY ADDENDUM

The Property subject to the Agreement is located on a pipe-stem lot and requires a common driveway. This will require the establishment of an easement over this lot and adjacent lots for the construction and maintenance of a common driveway to be shared by the owners of the affected lots. The easement will provide that the owners of the lots share equally in the care and maintenance of the driveway and that none of the owners may restrict the use of the driveway by the other owners. This easement may not be established prior to Settlement and Purchaser agrees to execute any documents necessary for the establishment and recordation of such an easement at any time after Settlement.

_____/_____
Purchaser's Initials

## MODEL HOME PURCHASE ADDENDUM

The Property shall, upon Settlement, be leased to the Seller for use as a model home pursuant to the terms of the Lease Agreement attached hereto. Accordingly, the following revisions are hereby made to the Purchase Agreement:

    a. Purchaser shall not have the right to select any options, nor shall change orders be allowed, except as may be permitted by Seller on a limited basis.

    b. The following personal property shall be included in the sale of the home and is included in the Purchase Price: _____

_____

Except as specifically provided above, all terms and conditions of the Agreement remain in full force and effect.

_____/_____
Purchaser's Initials

## PLAT RECORDATION ADDENDUM

The plat of subdivision ("Plat") which creates the Lot subject to this Agreement has not been recorded among the land records of the applicable County as of the date of this Agreement. This Agreement is expressly contingent upon the recordation of the Plat. If the Plat is not recorded within six (6) months after the date of this Agreement, Seller shall have the following options:

    a) Seller may terminate this Agreement and return the Deposit to the Purchaser upon Purchaser's execution of a Mutual Release Agreement, at which time this Agreement shall be null and void and neither party shall have any further obligations or liabilities to the other; or

    b) Seller may extend this contingency for an additional period, up to the Outside Delivery Date, as defined in paragraph 10 of the Agreement. If the Plat is still not recorded after the extension, any additional extensions beyond the Outside Delivery Date may only be given with Purchaser's consent. If Purchaser should not consent to further extensions, Seller shall return the Deposit to Purchaser upon Purchaser's execution of a Mutual Release Agreement, at which time this Agreement shall be null and void and neither party shall have any further obligations or liabilities to the other.

Prior to recordation of the Plat, Seller reserves the right to change the dimensions, boundary lines, shape or size of the Lot. In the event the Lot size is reduced from the initial plan signed by Purchaser by fifteen percent (15%) or more as a result of any changes to the plat of subdivision, Purchaser shall be notified by Seller in writing within ten (10) days of the date the plat is recorded and Purchaser, at Purchaser's option, may terminate this Agreement by providing written notice to Seller within five (5) days after receipt of said notice from Seller. If Purchaser elects to terminate this Agreement as provided in this addendum, Seller shall refund the Deposit upon Purchaser's execution of a Mutual Release Agreement, after which neither party shall have any further obligations or liability to the other. This Addendum shall not survive Settlement.

_____/_____
Purchaser's Initials

## WELL WATER ADDENDUM

The Property will be served by a private well water system. Seller shall provide all necessary approvals and permits for the construction of the water well. Seller will provide a water well which meets all applicable standards required by the city or county in which the Property is located. The water well shall be covered by Seller's Limited Warranty pursuant to the terms and conditions thereof with respect to defects in workmanship of the original installation of the water well. Seller's Limited Warranty does not cover issues related to water yield or water quality subsequent to Settlement.

_____/_____
Purchaser's Initials

## SEPTIC ADDENDUM

The Property will be served by a private septic system. Seller shall provide all necessary approvals and permits for the construction of the septic system. Seller will provide a septic system which meets all applicable standards required by the city or county in which the Property is located. Seller shall not be responsible for failure of the septic system occurring after Settlement, other than as specifically provided in Seller's Limited Warranty. Purchaser acknowledges that the size of the percolation field serving the septic system is designed and approved only for the number of bedrooms originally constructed in the home and that the number of bedrooms in the home may not be increased without significant modifications to the septic system by the Purchaser.

_____/_____
Purchaser's Initials

## WETLANDS ADDENDUM

Purchaser acknowledges that the Lot contains "wetlands" which are required to be left in their natural state. Purchaser agrees that it will maintain the "wetlands" in their natural state and abide by all covenants and restrictions that may be specified in the subdivision plat, and any federal, state or local laws or ordinances pertaining to "wetlands."

_____/_____
Purchaser's Initials

This Addendum, upon execution by the parties, is herewith made an integral part of the aforementioned Agreement.

PURCHASER:

DATE: _5/21/08_

DATE: _____

SELLER:
NVR, Inc. t/a ___Ryan Homes___

DATE: _____6/3/8_____

By: _____
Vice President

## AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE

This is to give you notice that NVR, Inc. ("Seller") has a business relationship with NVR Mortgage Finance, Inc. ("NVR Mortgage"), First NVR Settlement Services, LLC ("First NVR Settlement") and NVR Title Agency, LLC ("NVR Title").   Specifically, NVR Mortgage is a wholly-owned subsidiary of Seller; and First NVR Settlement and NVR Title are partially owned subsidiaries of NVR Settlement Services, Inc. which is a wholly owned subsidiary of NVR Mortgage.  Because of this relationship, this referral may provide Seller a financial or other benefit.

Set forth below is the estimated charge or range of charges for the services listed.  You are NOT required to use the listed provider(s) as a condition for the purchase of the Property.  THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES.  YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

| Description of Charge | Estimated Charges |
|---|---|
| 1. Application fee | $300.00 to $500.00 |
| 2. Loan origination fee | 1% to 2% |
| 3. Credit report | $25.00 to $100.00 |
| 4. Appraisal | $250.00 to $500.00 |
| 5. Title exam fee | $100.00 to $500.00 |
| 6. Settlement or closing fee | $250.00 to $500.00 |
| 7. Lender's title insurance premium | $325.00 to $5,000.00 |
| 8. Owner's title insurance premium | $450.00 to $6,000.00 |
| 9. Title Insurance Binder Fee | $50.00 to $200.00 |

**ACKNOWLEDGEMENT**

I/We have read this disclosure, and understand that Seller is referring me/us to purchase the above-described settlement services and may receive a financial or other benefit as the result of this referral.

5/21/08
Date

_Andrea L Bryan_
Purchaser

_____
Date

_____
Purchaser

Lot 35-4  Block ___      Community ___  Belsley Park PN

# ADDENDUM TO PURCHASE AGREEMENT
## RESALE LIMITATIONS

Resale Limitations Addendum made this 21 day of _____ May _____, 20 08 to a Purchase Agreement by and between  NVR,  Inc.  t/a   Ryan Homes  ("Seller")  and   Andrea L Bryner   and _____ (collectively, "Purchaser"), dated _____ 05/21/08 _____ (the "Agreement") with respect to certain property ("Property") as defined in the Agreement.

The undersigned Purchaser and Seller hereby agree to the following:

1.      Purchaser hereby acknowledges that [CHECK BOX A, B, C OR D BELOW]:

[X]   A.    Purchaser is acquiring the Property as Purchaser's principal residence and will occupy and reside in the Property.

[ ]   B.    Purchaser is acquiring the Property as a model home pursuant to the attached Model Home Addendum.

[ ]   C.    Purchaser is acquiring the Property as a second home.

[ ]   D.    Purchaser is acquiring the Property as an investor. The Property will not be the Purchaser's principal residence. The Purchaser will not occupy and reside in the Property. The Property is not being acquired by Purchaser as a second home.

2.     Purchaser hereby represents and warrants to Seller the truth and accuracy of Purchaser's acknowledgement contained in paragraph 1 immediately above and understands and agrees that the truth and accuracy of the acknowledgement, as provided by Purchaser, is being relied upon by Seller and has been a material inducement to Seller's entering into the Agreement and/or this Resale Limitations Addendum. For purposes of this Addendum (including the application of the paragraphs below) if Purchaser's acknowledgement contained above in paragraph 1 is not true and accurate, or if Purchaser's status changes prior to Settlement, Purchaser shall be deemed to have checked the box in paragraph 1 that truly and accurately reflects the circumstances involving the Purchaser's acquisition of the Property. In such event, Seller may require the Purchaser to increase the Deposit, at the Seller's discretion. Under such circumstances, the Deposit increase shall be due and payable to the Seller within ten (10) days after Seller's request for such additional Deposit is made. Purchaser's failure to fund any such increase of the Deposit shall be deemed to be a material breach of the Agreement.

3.     Purchaser hereby represents and warrants to Seller that if either box 1C or box 1D applies (in paragraph 1 of this Resale Limitations Addendum) that:

(a)     From the date of this Resale Limitations Addendum and through and including a period of twelve (12) X /eighteen (18) __ / twenty-four (24) __ months following recordation of the deed transferring the Property from Seller to Purchaser (the "Sale Restriction Period"), Purchaser will not directly or indirectly offer for sale, with or without a broker/agent, or conditionally sell, sell, transfer or convey the Property to any individual or entity. A sale or transfer of thirty five percent (35%) or more of any ownership interest of an entity that has contracted to purchase the Property, or is the owner of the Property by deed, shall be deemed to be a sale or transfer for purposes of this paragraph 3(a). If Purchaser violates the terms and conditions contained herein, by conditionally selling, selling, transferring or conveying the Property within the Sale Restriction Period, Purchaser shall immediately pay over to Seller all cash proceeds and all other proceeds from such conditional sale, sale, transfer or conveyance in excess of the Purchase Price (as defined in the Agreement). Under the following circumstances, and subject to Seller being provided documentation reasonably satisfactory to Seller, as well as thirty (30) days advance written notice of any proposed conditional sale, sale, transfer or conveyance, Seller shall waive the Sale Restriction Period for the following reasons: (a) foreclosure, or (b) the permanent disability or death of an individual or individuals named on the deed to the Property; and

(b)     If Seller becomes aware of any efforts on Purchaser's part to conditionally sell, sell, transfer or convey the Property or otherwise has a reasonable basis for believing Purchaser has violated the terms contained herein, Purchaser shall cooperate with Seller by promptly providing information and documentation responsive to written inquiries initiated by Seller. Purchaser shall be responsible to Seller for reasonable attorneys fees incurred by Seller: (i) in enforcing its rights to obtain information hereunder; (ii) with respect to any effort by Seller to collect all cash proceeds and all other proceeds in excess of the Purchase Price as permitted above in paragraph 3(a); and (iii) as otherwise may be incurred by Seller in enforcing its rights pursuant to this Resale Limitations Addendum.

MHBR NO. 56

Updated 8/28/07

Lot 354 Block (              Community (          Heisley Park PN

4. **If the 1D box in paragraph 1 of the Resale Limitations Addendum applies** the parties additionally agree:

(a) Section 3 of the Agreement (Mortgage Loan) is hereby deleted in its entirety and replaced with the following:

"3. **No Financing Contingency.** Purchaser acknowledges and agrees that (i) the purchase of the Property is in no way contingent on Purchaser obtaining financing from a mortgage lender or any other party, and (ii) the failure of Purchaser to obtain any financing required to purchase the Property, regardless of the cause, shall constitute a default under this Agreement and Seller shall have the right to exercise any remedies it may have under this Agreement, including retention of the Deposit. In addition to the foregoing, if Purchaser intends to obtain financing to purchase the Property, Purchaser shall promptly apply for such financing, shall use good faith efforts to obtain such financing, and shall provide Seller with any and all documentation regarding such financing as may be reasonably requested. Purchaser's failure to do any of the foregoing shall constitute a default under this Agreement, in which case Seller shall have the right to exercise any remedies it may have under this Agreement, including retention of the Deposit." ; and

(b) Section 5(b) of the Agreement is hereby deleted in its entirety.

5. Purchaser hereby represents and warrants to Seller that if the Purchase Price under the Agreement increases as a result of a Purchaser initiated, and Seller approved, change to the Master Selection Sheet, and Seller requests an increase in the Deposit, Seller may require the Purchaser to increase the Deposit, at the Seller's discretion. Under such circumstances, the Deposit increase shall be due and payable to the Seller as of the date the Seller approves the change(s) to the Master Selection Sheet. Purchaser's failure to fund any such increase as to the Deposit shall be deemed to be a material breach of the Agreement.

6. Except as specifically provided by this Resale Limitations Addendum, all other terms and conditions of the Agreement (and any exhibits, addendum and amendments thereto) shall remain unchanged and in full force and effect. Capitalized terms contained in this Resale Limitations Addendum shall have the meaning ascribed to them in the Agreement. The terms of this Resale Limitations Addendum shall survive recordation of the deed transferring the Property from Seller to Purchaser.

This Resale Limitations Addendum, upon execution by both parties, is herewith made an integral part of the aforementioned Agreement.

PURCHASER:

DATE: 5/21/08

DATE:_____

SELLER:

NVR, Inc. t/a ___Ryan Homes___

DATE: 6/3/8

By:_____
Its:  (Vice President and Division Manager

MHBR NO. 56

Updated 8/28/07

Lot __354__ Block _____          Community _____ __Heisley Park PN__

## MORTGAGE INTEREST RATE LOCK-IN ACKNOWLEDGMENT

The undersigned Purchaser has entered into a Purchase Agreement for the Property known as : _YPN 354_
and located in the __Heisley Park PN__ Community (the "Property").

By signing below, Purchaser acknowledges they have been informed of and understand the following
information relating to the Property:

1.  Purchaser acknowledges that locking-in the interest rate prior to completion of drywall installation
may increase the chance that the interest rate will change prior to Settlement.

2.  Purchaser acknowledges that NVR, Inc. has no obligation or liability in regards to the timing for
locking-in the interest rate to be paid by Purchaser on Purchaser's mortgage.

ACKNOWLEDGED BY PURCHASER:

Purchaser: _____

Purchaser: _____

Date: _____5/21/08_____



Lot __354__ Block _____                                    Community _____ Heisley Park PN _____

## NATURAL MATERIALS ACKNOWLEDGMENT

The undersigned Purchaser has entered into a Purchase Agreement for the Property known as __PN 354__
and located in the __Heisley Park PN__ Community (the "Property").

By signing below, Purchaser acknowledges they have been informed of and understand the following
information relating to the Property:

1.  There are unavoidable imperfections that occur in the use of natural materials such as wood, marble,
granite and brick.  These imperfections include, but are not limited to, variations in color, grain, texture,
veins and finish.  In addition color, texture, and other qualities of natural materials can change over time.

2.  Due to the imperfections in natural materials, there will likely be non-uniform characteristics found in
hardwood flooring, rails and stairs, wood cabinets, marble fireplace surrounds, granite countertops, and
brick that may be installed in your home.  Any of these products installed in your home may vary from
samples shown.

3.  NVR, Inc. makes no representation or warranty as to color, grain, texture, finish or other imperfections
that may occur in the use of natural materials and Purchaser accepts these inherent risks associated with
the use of products made with natural materials.  Changes in characteristics in these materials which occur
naturally over time are not covered by the NVR Limited Warranty.

ACKNOWLEDGED BY PURCHASER:

Purchaser: _____

Purchaser: _____

Date: _____5/21/08_____

Lot _0354_                                    Community _ Heisley Park PN _

## SEASONAL CONDITIONS ACKNOWLEDGMENT

The undersigned Purchaser has entered into a Purchase Agreement for the Property known as _PN 354_
and located in the _Heisley Park PN_ Community (the "Property").

By signing below, Purchaser acknowledges they have been informed of and understand the following
information relating to the Property:

In the event the home is not occupied for an extended period, particularly during variable temperature and
weather conditions, Purchaser is responsible for taking all reasonable steps necessary to protect the
Property from damage which can be caused by such variable temperatures and weather conditions, such
as, but not limited to, frozen pipes and water leaks. It is recommended that at no time should the Property
be left unheated. In addition, the water heater (gas or electric) supply should be turned off. Also, the
main water supply should be turned off and the house water lines and exterior hose bibs must be drained.

In no event shall Seller be responsible for any damage to the Property resulting from or otherwise
attributable to the Property remaining unoccupied for any extended period, regardless of the time of year.

ACKNOWLEDGED BY PURCHASER:

Purchaser: _Andrea J Brown_

Purchaser: _____

Date: _5/21/08_

MHBR NO. 56
Updated 020806

Lot _354_ Block _____

Community _____ Heisley Park PN

# COMMUNITY PLANS ACKNOWLEDGMENT

The undersigned Purchaser has entered into a Purchase Agreement for the Property known as _PN .354_ and located in the ____ **Heisley Park PN** ____ Community (the "Property").

By signing below, Purchaser acknowledges they have been informed of and understand the following information relating to the Property:

1. Purchaser acknowledges, by initialing next to each plan (collectively the "Plans"), that the following Plans have been provided or shown to the Purchaser:

Architectural Blueprints        x _NB_
Site Plan                       x _NB_
Record Plat                     x _NB_
Forest Conservation Plan
Community Landscaping Plan       x _NB_
Storm Water Management Plan     x _NB_
Sediment Control Plan
Tree Conservation Plan 1
Tree Conservation Plan 2
_____
_____

2. The above Plans are believed to be accurate as of the date hereof; however, no warranties or representations whatsoever are made concerning the present or continuing accuracy of the Plans.

3. Purchaser acknowledges that the above Plans are subject to change and in order to obtain the most current and accurate information, the Purchaser should contact the appropriate governmental planning office.

ACKNOWLEDGED BY PURCHASER:

Purchaser: _____

Purchaser: _____

Date: _____ _5/21/08_ _____



Lot __354__ (      Community __yol__

# CHANGE ORDER POLICY

Ryan Homes offers a wide variety of options for our buyers to personalize each home to meet their individual needs and requirements. The building of a home requires literally hundreds of components, many which have to be ordered well before construction begins. Any changes after the Purchase Agreement is processed could adversely affect the schedule of the home. Additionally, many changes requested after the time of contract require additional administrative, engineering, and permit approval time, which makes the changes, not only cost prohibitive, but can cause significant time delays in starting and the constructing the home. The following Change Order Policy must be strictly adhered to in an effort to minimize these delays and additional expenses.

By signing below, Purchaser(s) acknowledge they have been informed of and understand the following information relating to the property:

1. A standard change order request is a request to add or delete an option from the Master Selection Sheet after the original Purchase Agreement has been signed. This includes any changes to the Master Selection Sheet color pages and appliance acknowledgement.

2. Purchaser acknowledges and agrees the selection sheet accurately reflects all options selected by the Purchaser as of the date of the Purchase Agreement.

3. Purchaser may request changes to the selection sheet within ten (10) days from the date of the Purchase Agreement.

4. Any request for changes submitted by the Purchaser after ten (10) days from the date of the Purchase Agreement shall be accompanied by a processing fee of two hundred-fifty dollars ($250.00) for any and all changes. (This includes kitchen cabinets, countertops, flooring, structural options, changing house type, changing house elevation, changing home site, adding projections to the house, electrical outlets, color changes etc.)

5. No request for changes will be received or accepted by the Seller after twenty-one (21) days from the date of the Purchase Agreement.

6. Construction delays due to changes could affect the interest rate lock and Purchaser would be responsible to pay any extension fees or accept any rate increases.

7. The purchase price of the house shall be increased or decreased to reflect any changes in the Purchaser's selections.

8. Seller reserves the right to reject any requested changes in its sole discretion.


ACKNOWLEDGED BY PURCHASER:

Purchaser: _____      Ten (10) days: _____

Purchaser: _____      Twenty-One (21) Days: _____

Date: __5/24/08__

Ryan Homes
9/2003

Lot 354 Block _____                                    Community Helsey Park

# FHA/VA ADDENDUM TO PURCHASE AGREEMENT

Addendum made this 29 day of May , 20 08 to a Purchase Agreement by and between NVR, Inc. t/a

Ryan Homes ("Seller") and Andrea L. Bryner and _____ (collectively,

"Purchaser"), dated 5-21-08 (the "Agreement").

The undersigned Purchaser and Seller hereby agree to the following:

1. Purchaser shall obtain a ☐ VA guaranteed ☒ FHA insured mortgage loan secured by the Property in the amount of the Purchase Price as defined in the Agreement.

2. Purchaser agrees to pay all costs and charges in connection with the VA or FHA loan in accordance with VA or FHA regulations, including, but not limited to, loan origination fees, funding fees, and mortgage insurance premiums, as applicable. Lender's fees charged to the Seller shall be paid by Seller.

3. It is expressly agreed that notwithstanding any other provisions of this Agreement, Purchaser shall not be obligated to complete the purchase of the Property or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the Purchaser has been given in accordance with HUD/FHA or VA requirements a written statement by the Federal Housing Commissioner, Department of Veteran's Affairs or a Direct Endorsement lender setting forth the appraised value of the Property of not less than the Purchase Price as defined in the Agreement to be paid at Settlement, less the Non-Cash Discount also defined in the Agreement. The purchaser shall have the privilege and option of proceeding with consummation of the Agreement without regard to the amount of the appraised valuation. The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development ("HUD") will insure. HUD does not warrant the value or the condition of the Property. The Purchaser should satisfy himself/herself that the Purchase Price and the condition of the Property are acceptable.

4. If Purchaser is obtaining a VA guaranteed loan, the Deposit paid by an eligible veteran shall be placed in a trust account pursuant to Title 38, U.S. Code, Section 3706.

5. All other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

This Addendum, upon execution by both parties, is herewith made an integral part of the aforementioned Agreement.

PURCHASER:

DATE: 5-29-08 _____

DATE: _____

DATE: 6/3/8 _____

SELLER:
NVR, Inc. t/a Ryan Homes

By: _____
Vice President

MHBR NO. 56
Updated 11407

Lot _354_ Block _____          Community _PN_

## BROKERAGE ADDENDUM TO PURCHASE AGREEMENT

Addendum made this _21_ day of _May_, 20_08_ to a Purchase Agreement by and between NVR, Inc. t/a _Ryan Home_ ("Seller") and _Andrea L Bryne_ and _____ (collectively, "Purchaser"), dated _5/21/08_ (the "Agreement").

The undersigned Purchaser and Seller hereby agree to the following:

1. Purchaser warrants to Seller that this sale was brought about solely by the sales personnel of Seller and that no outside broker or salesperson was the procuring cause of this sale, except _Matt Bricco_ ("Agent") of _Northland Realty_ ("Broker"). Purchaser agrees to hold Seller harmless and to defend Seller against any claim for compensation of any kind made by any agent or broker in connection with this Agreement except for the Agent and Broker identified above.

2. Seller shall pay Broker a commission in the amount of either:

☐ ___ % of $_____ ; or

☒ $ _2,000_

payable upon disbursement of funds at Settlement. Any commission due to Broker shall not be deemed earned until Settlement and Broker shall be paid by Seller from the Settlement proceeds.

3. All other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

This Addendum, upon execution by both parties, is herewith made an integral part of the aforementioned Agreement.

PURCHASER:

DATE: _5/21/08_ _____     _Andrea L Bryne_

DATE: _____

DATE: _6/3/8_ _____

SELLER:
NVR, Inc. t/a _Ryan Homes_
By: _____
    Vice President

Broker Information:
Name: _Matt Bricco_
Address: _5444 _____ Rd._
         _Parma, OH_
Phone: _216-410-0436_

BR NO. 56
ated 10/02/03



May 22 2008 4:01PM    HP LASERJET FAX                                        P.1
Oct 19 2007  2:50 PM FR RYAN HOMES CLE    4403495068 TO MODEL PN            P.02

PN354

## Broker- Prospect Registration Agreement

Dear Cooperating Broker:

We want our relationship with you to develop into one of mutual trust and friendly cooperation. Please read and sign this agreement so that we may be sure you have been made aware of our policies.

You will be paid a $2,000 referral fee with a $500 increase for each incremental sale brought to us in a calendar year. (Ie: $2,500 for 2nd realtor sale, $3,000 for 3rd sale, etc.). This commission is paid at closing.

1. We require you to physically accompany your prospect on their first visit to our community and register them with the community Sales and Marketing Representative. (We invite you to preview our community before bringing your prospects.)

   - We want to meet you.

   - We'd like to acquaint you with our options and features.

2. You will be protected for 30 days from the registration date. If you or your customer has no further contact with our Sales and Marketing Representative during this period, please re-register your customer.

   - Whenever you return with your customer, you may re-register for another 30 days.

   - We need full information on your customer to protect you.

   - If your customer returns or calls without you, within the first 30 days, we will notify you.

3. Our Sales and Marketing Representative will assume the primary selling and orientation responsibility by providing information on the community, different house types, financing, delivery dates, etc.

   - Please let us show the homes. They are all decorated differently and options and standard items can vary from community to community.

   - Our Sales Coordinators are also trained to show our homes.

4. Our Sales and Marketing Representative will also write the purchase agreement on our company form and present it for ratification. (You will receive a copy of the ratified agreement.)

   - We will qualify your customer and write the contract.

   - You will not need to be present at the signing.

   - You will receive a Fee Verification form to turn into your broker.

5. Our Sales and Marketing Representative will also help the buyer make color selections, choose options and explain our convenient "one-stop shopping" with financing through our mortgage company.

6. We will notify you and your customer of the settlement dates. It is not necessary for you to attend, but you are welcome.

7. If your customer has a home to sell, we would appreciate your maintaining contact with our Sales and Marketing Representative regarding the disposition of the home.

   - We will not start construction on any new home that is contingent upon the sale of their existing home.

8. At Settlement, your commission will be distributed to your broker.

   - The monies will be distributed after recordation as is customary.

X _Greco_          5/23/08
REALTOR SIGNATURE

_Andrea S. Bryan_
CUSTOMER SIGNATURE

CUSTOMER SIGNATURE

_5/21/08_
DATE

RYAN HOMES SALES AND MARKETING
REPRESENTATIVE SIGNATURE

HOMES CLE    4403495068 TO    EL PN        P.02

# Broker– Prospect Registration Agreement

Dear Cooperating Broker:

We want our relationship with you to develop into one of mutual trust and friendly cooperation. Please read and sign this agreement so that we may be sure you have been made aware of our policies.

You will be paid a $2,000 referral fee with a $500 increase for each incremental sale brought to us in a calendar year. (ie: $2,500 for 2nd realtor sale, $3,000 for 3rd sale, etc.). This commission is paid at closing.

1. We require you to physically accompany your prospect on their first visit to our community and register them with the community Sales and Marketing Representative. (We invite you to preview our community before bringing your prospects.)

   - We want to meet you.

   - We'd like to acquaint you with our options and features.

2. You will be protected for 30 days from the registration date. If you or your customer has no further contact with our Sales and Marketing Representative during this period, please re-register your customer.

   - Whenever you return with your customer, you may re-register for another 30 days.

   - We need full information on your customer to protect you.

   - If your customer returns or calls without you, within the first 30 days, we will notify you.

3. Our Sales and Marketing Representative will assume the primary selling and orientation responsibility by providing information on the community, different house types, financing, delivery dates, etc.

   - Please let us show the homes. They are all decorated differently and options and standard items can vary from community to community.

   - Our Sales Coordinators are also trained to show our homes.

4. Our Sales and Marketing Representative will also write the purchase agreement on our company form and present it for ratification. (You will receive a copy of the ratified agreement.)

   - We will qualify your customer and write the contract.

   - You will not need to be present at the signing.

   - You will receive a Fee Verification form to turn into your broker.

5. Our Sales and Marketing Representative will also help the buyer make color selections, choose options and explain our convenient "one-stop shopping" with financing through our mortgage company.

6. We will notify you and your customer of the settlement dates. It is not necessary for you to attend, but you are welcome.

7. If your customer has a home to sell, we would appreciate your maintaining contact with our Sales and Marketing Representative regarding the disposition of the home.

   - We will not start construction on any new home that is contingent upon the sale of their existing home.

8. At Settlement, your commission will be distributed to your broker.

   - The monies will be distributed after recordation as is customary.

X

REALTOR SIGNATURE

_Andrea S Brown_

CUSTOMER SIGNATURE


CUSTOMER SIGNATURE

5/21/08

DATE

RYAN HOMES SALES AND MARKETING
REPRESENTATIVE SIGNATURE

** TOTAL PAGE.02 **



**EXHIBIT B**

## APPLICATION FOR BUILDING PERMIT

**CITY OF Painesville**
Community Development Dept.
7 Richmond St., Painesville, OH 44077
Ph #(440) 392-5931, Fax (440) 392-0981

BP# _____

### READ THE FOLLOWING INSTRUCTIONS BEFORE COMPLETING APPLICATION

1. All drawings, including plot plans, elevations, and floor plans, shall have SEVEN sets for OBC Construction and THREE sets for RCO, complete with wall sections showing footer, foundation, floor, wall and roof construction, indicating all structural members, size, spacing, material, etc. Two copies of specifications for the work must be submitted, or the specifications may appear on the plans. The name and address of the author shall be plainly printed in the lower right corner on all plans or drawings.

2. All plans submitted shall provide sufficient information and detail to determine full compliance with the requirements of the Ohio Basic Building Code (OBC) or Ohio Building Official Association (OBOA).

3. Section 4703.18 R.C. (Extracted and Paraphrased) The first sheet of each set of plans submitted to the municipal certified building department, shall be signed and sealed in a conspicuous place on the sheet by the person drawing the plans.

**PROJECT LOCATION/ADDRESS** 996 Cedarberry Ct.

Job Description  single family home

Parcel ID# _____   Zoning District _____

**VALUATION OF PROJECT $** 1,116,162

Change of use ☐   New ☑   Addition ☐   Alteration ☐   Article 25 ☐

**PLANS PREPARED BY and Ohio Registration No. (if applicable)**

Architect  Ryan Homes

Engineer  Ryan Homes

Sprinkler System Designer _____

Other _____

**OWNER'S NAME**  NVR, Inc. dba Ryan Homes

Address  30700 Bainbridge Rd #A

Solon, OH 44139

Telephone  (440) 349-5000

Cell Phone  (440) 465-6952

**APPLICANT'S NAME**  Ryan Homes

Address  30700 Bainbridge Rd #A

Solon, OH 44139

Telephone  440, 349-5000

Cell Phone  440, 465-6952

**To Calculate Floor Area:**
1. Measure to outside walls for dimensions.
2. Include supported canopies as measured from center lines of the furthest columns or supports.
3. Do not include roofs or canopies, which cantilever from building.

**Square Footage per Floor(s):**

| | |
|---|---|
| Basement | 1146 |
| First Floor | 1146 |
| Mezzanine | |
| 2nd  Additional Floors | 884 |
| **TOTAL SQUARE FOOTAGE** | 3176 |

**Estimated Cost of Site Work $** 116,162

**Type of Construction (check one)**

| | | | | |
|---|---|---|---|---|
| 1A ☐ | 2A ☐ | 3A ☐ | 4 ☐ | 5A ☐ |
| 1B ☐ | 2B ☐ | 3B ☐ | | 5B ☐ |
| | 2C ☐ | | | |

**Proposed OBC Use Group (check one)**

| | | | |
|---|---|---|---|
| A1A ☐ | A1B ☐ | A2 ☐ | A3 ☐ |
| A4 ☐ | A5 ☐ | B ☐ | E ☐ |
| F1 ☐ | F2 ☐ | H ☐ | I1 ☐ |
| I2 ☐ | M ☐ | R1 ☐ | R2 ☐ |
| R3 ☐ | R4 ☐ | S1 ☐ | S2 ☐ |

Specify number of apartments or units _____

**For Internal Use Only**

FEE AMOUNT          $ _____
3% or 1% CHARGE  $ _____
If applicable
TOTAL                    $ _____
Check ☐  Cash ☐
Check # _____

Approval: _____

Signature of Applicant, Title    (signed) for Ryan Homes     Date 10/18/08

Please remember that a minimum of 48 hours advance notice is required for scheduling inspections. However this does not guarantee next-day inspections

**IMPORTANT NOTICES:**

Section 3781.04 R.C. (Extracted and Paraphrased) It is unlawful to enter into contract for or begin the construction of a new building/structure, the alteration of or addition to an existing building/structure, and/or changing the occupancy of an existing building/structure before receiving approved plans.

Ohio Environmental Protection Agency (EPA) Regulations Chapters 3704, 3734, 6109, 6111, 3745 of the Ohio Revised Code and rules of the Ohio EPA provide generally that no person may install or modify an air contaminant source; a disposal system, including sewerage and treatment works, a solid waste disposal facility; or a waste disposal facility; or a waste supply system without obtaining prior approval and/or permits from the Ohio Environmental Protection Agency. Therefore, if this structure requires such a system, you must contact the nearest Ohio EPA district office.

JULY 1 5 2005

Revised March 2004



EXHIBIT

C-1



CITY OF

# Painesville

7 Richmond Street • P.O. Box 601 • Painesville, Ohio 44077 • 440.352.9301 • www.painesville.com

June 25, 2008

# PLAN REVIEW

NVR Inc. / Ryan Homes
30700 Bainbridge Road – Suite A
Solon, Ohio 44139

RE: R#08-51   Proposed single-family dwelling
496 Cebarberry Court (PN 354)
Innsbruck - Elevation "A" - 3-bedroom model with morning room.

Dear Sir or Madam:

Subject plans have been reviewed for conformance with the 2006 *Residential Code of Ohio for One, Two and Three Family Dwellings, and the City of Painesville Housing Code.* The plans are approved with the following contingencies.

The structural elements of these drawings have not been checked. The sufficiency of these elements to meet all code requirements is the responsibility of the author of the drawings.

Occupancy Load. The occupancy load for this structure has been determined to be <u>9</u> persons.

BUILDING REVIEW

**R321.1   Premises identification.**
Approved numbers or addresses shall be provided for all new buildings in such a position as to be plainly visible and legible from the street or road fronting the property. *Street address shall be posted on the site prior to starting work and shall be prominently displayed on the structure during construction.*

**R404.1.7   Backfill Placement**
Backfill shall not be placed against the foundation wall until the wall has sufficient strength and has been anchored to the floor above, or has been sufficiently braced to prevent damage by the backfill.

**R905.2.7.1 – Ice Protection.**
Provide ice dam membrane along eaves extending to a point at least 24 inches *inside the exterior wall line of the building.*

**R313.1 - Smoke alarms.**
Smoke alarms shall be installed in the following locations:
1. In each sleeping room.
2. Outside each separate sleeping area in the immediate vicinity of the bedrooms.
3. On each additional story of the dwelling, including basements but not including crawl spaces and uninhabitable attics. In dwellings or dwelling units with split-levels and without an intervening door between the adjacent levels, a smoke alarm installed on the upper level shall suffice for the adjacent lower level provided that the lower level is less than one full story below the upper level.

When more than one smoke alarm is required to be installed within an individual dwelling unit the alarm devices shall be interconnected in such a manner that the actuation of one alarm will activate all of the alarms in the individual unit. The alarm shall be clearly audible in all bedrooms over background noise levels with all intervening doors closed.

All smoke alarms shall be listed and installed in accordance with the provisions of this code and the household fire warning equipment provisions of NFPA 72.

4. Glazing in Section R308.4, Item 6, in walls perpendicular to the plane of the door in a closed position or where access through the door is to a closet or storage area 3 feet (914 mm) or less in depth. Glazing in these applications shall comply with Section R308.4, Item 7.
5. Glazing in Section R308.4, Items 7 and 10, when a protective bar is installed on the accessible side(s) of the glazing 36 inches_2 inches (914mm_51 mm) above the floor. The bar shall be capable of withstanding a horizontal load of 50 pounds per linear foot (74.5 kg/m) without contacting the glass and be a minimum of 11/2 inches (38 mm) in height.
6. Outboard panes in insulating glass units and other multiple glazed panels in Section R308.4, Item 7, when the bottom edge of the glass is 25 feet (7620 mm) or more above grade, a roof, walking surface, or other horizontal [within 45 degrees (0.79 rad) of horizontal] surface adjacent to the glass exterior.
7. Louvered windows and jalousies complying with the requirements of Section R308.2.
8. Mirrors and other glass panels mounted or hung on a surface that provides a continuous backing support.
9. Safety glazing in Section R308.4, Items 10 and 11 is not required where:
   9.1. The side of a stairway, landing or ramp has a guardrail or handrail, including balusters or in-fill panels, complying with the provisions of Sections 1003.3.12 and 1607.7 of the Ohio Building Code; and
   9.2. The plane of the glass is greater than 18 inches (457 mm) from the railing.

## GARAGES

### R309.1 - Opening protection.
Openings from a private garage directly into a room used for sleeping purposes shall not be permitted. Other openings between the garage and residence shall be equipped with solid wood doors not less than 13/8 inches (35mm) in thickness, solid or honeycomb core steel doors not less than 13/8 inches (35 mm) thick, or 20-minute fire-rated door or equivalent, and shall be furnished with a self-closing mechanism.

### 309.2 Separation required.
The garage shall be separated from the residence and its attic area by not less than ½-inch (12.7 mm) gypsum board applied to the garage side. Garages beneath habitable rooms shall be separated from all habitable rooms above by not less than 5 / 8 -inch (15.9 mm) Type X gypsum board or equivalent. Where the separation is a floor-ceiling assembly, the structure supporting the separation shall also be protected by not less than ½-inch (12.7 mm) gypsum board or equivalent.

### R506.2.3 Vapor retarder
A 6 mil polyethylene or approved vapor retarder with joints lapped not less than 6 inches shall be placed between the concrete floor slab and the base course or the prepared subgrade where no base course exists.

### R309.1.1 - Duct penetration.
Ducts in the garage and ducts penetrating the walls or ceilings separating the dwelling from the garage shall be constructed of a minimum No. 26 gage (0.48 mm) sheet steel or other approved material and shall have no openings into the garage.

### R405.1 -- Foundation Drainage
Alternate approved foundation drainage systems shall be installed in accordance with their listing and approvals. (ESR-1107)

### R406.1 & 2 -- Foundation Waterproofing and Dampproofing
In areas where a high water table or other severe soil-water conditions are known to exist, exterior foundation walls that retain earth and enclose habitable or usable spaces located below grade shall be waterproofed with a membrane extending from the top of the footing to the finished grade.

Alternate approved waterproofing/dampproofing systems shall be installed in accordance with their listing and approvals. (NER-480 and 22-13)

## ELECTRICAL REVIEW
Effective April 1, 2008, the electrical system may be in conformance with the National Electrical Code 2005 Edition.

### NEC 250-50
Section 250.50 of the National Electrical Code requires that all grounding electrodes as described in Section 250.52(A)(1) through (A)(6) that are present at each building or structure shall be bonded together to form the grounding electrode system.

- Each directly connected floor drain shall have a means of maintaining a permanent water trap seal, and be in full view at all times.
- Hangers and supports shall be provided on all drainage and vent piping and water supply lines as per code.
- Insulate all domestic hot water and heating hot water piping in conditioned or unconditioned spaces with R-4 insulation.
- All air admittance valves will be subject to a final air test.

- HVAC General Notes
  - This structure is required to comply with the International Model Energy Code.  Therefore, it is determined that all combustion air is required to be taken from the outdoors.
  - The installation of comfort heating and cooling appliances shall conform to the conditions of their listing and manufacturer's operating instructions and shall remain attached to the appliance.
  - Heat-producing appliances and comfort-cooling appliances shall not be located in a garage unless precautions are taken to protect such equipment from impact by automobiles.
  - Heat-producing appliances and comfort-cooling appliances which generate a glow, spark or flame capable of igniting flammable vapors and is located in a garage shall be installed with the burners, burner ignition devices or heating elements and switches at least 18 inches above the floor level.
  - Make up and combustion air for furnaces located in a garage must be taken from outside the dwelling to prevent the recirculation of automobile exhaust fumes.
  - An unobstructed working space not less than 30 inches in depth and the height of the furnace shall be provided along the entire front of the firebox side of every warm-air furnace when the door of the furnace enclosure is open.

The applicant is hereby notified that he is responsible for conformance with all applicable requirements of the Residential Code of Ohio, the City of Painesville Building Code, and all other applicable codes and regulations, whether or not they are noted herein as contingencies.  If you find that you require further clarification on this plan review please contact the Community Development Department.

The approval of residential construction documents and specifications or data in accordance with this rule is invalid if construction, erection, alteration or other work upon the residential building has not commenced within 12 months of the approval of the residential construction documents and specifications.

One extension shall be granted for an additional 12-month period if requested by the owner at least 10 days in advance of the expiration of the approval and upon payment of a fee not to exceed $100.

Sincerely

Edward Cox,
Building Official

cc: file

EXHIBIT

**C-2**

# ES REPORT™

**ESR-1107**

Reissued July 1, 2005

*This report is subject to re-examination in two years.*

**ICC Evaluation Service, Inc.**
www.icc-es.org

Business/Regional Office ¤ 5360 Workman Mill Road, Whittier, California 90601 ¤ (562) 699-0543
Regional Office ¤ 900 Montclair Road, Suite A, Birmingham, Alabama 35213 ¤ (205) 599-9800
Regional Office ¤ 4051 West Flossmoor Road, Country Club Hills, Illinois 60478 ¤ (708) 799-2305

DIVISION: 02—SITE CONSTRUCTION
Section: 02620—Subdrainage

**REPORT HOLDER:**

AMERICAN WICK DRAIN CORPORATION
1209 AIRPORT ROAD
MONROE, NORTH CAROLINA 28110
(704) 238-9200
www.americanwick.com
info@americanwick.com

**EVALUATION SUBJECT:**

AKWADRAIN™ FOUNDATION STRIP DRAIN

**ADDITIONAL LISTEES:**

DRY DOG BARRIERS, LLC
POST OFFICE BOX 743
MATTHEWS, NORTH CAROLINA 28106

EPRO SERVICES, INC.
PO BOX 347
DERBY, KANSAS 67037
(316) 262-2513
eproserv@aol.com

TREMCO BARRIER SOLUTIONS, INC.
6402 EAST MAIN STREET
REYNOLDSBURG, OHIO 43230
(614) 322-4420
www.tremcoinc.com
wellsja@tremcoinc.com

**1.0 EVALUATION SCOPE**

Compliance with the following codes:

- 2003 *International Building Code*® (IBC)
- 2003 *International Residential Code*® (IRC)
- 1997 *Uniform Building Code*™ (UBC)
- BOCA® *National Building Code*/1999 (BNBC)
- 1999 *Standard Building Code*® (SBC)

Property evaluated:

Foundation drainage system

**2.0 USES**

AKWADRAIN™ Foundation Strip Drains are used as alternatives to conventional sand- or gravel-covered pipe drains installed around building foundations in accordance with the applicable code.

**3.0 DESCRIPTION**

**3.1 General:**

AKWADRAIN™ Foundation Strip Drain is a composite drainage system consisting of a three-dimensional drainage core and a nonwoven, needle-punched filter fabric and fittings. The filter fabric is wrapped around and bonded to the drainage core, preventing intrusion of backfill material and the filter fabric into the flow channels during backfilling. Soil particles are held back by the filter fabric, allowing water to pass through to the drainage core.

AKWADRAIN™ Foundation Strip Drain is 1 inch (25.4 mm) deep, and is available in standard nominal widths of 6, 12, 18, 24 and 36 inches (152, 305, 457, 610 and 914 mm, respectively) and roll lengths of 50 feet (152 m) to 500 feet (1524 m).

**3.2 Components and Fittings:**

**3.2.1 Rigid Core:** The Rigid Core component of the AKWADRAIN™ Foundation Strip Drain is thermoformed from a black extruded plastic to form an internal dimpled drainage core with a 1-inch (25.4 mm) depth.

**3.2.2 Filter Fabric:** The Filter Fabric component of the AKWADRAIN™ Foundation Strip Drain is a geotextile, made from polypropylene, that is black in color, nonwoven and needle-punched for water flow.

**3.2.3 Splice Fitting:** Splice fittings are used to connect rolls of AKWADRAIN™ together using a minimum 3-inch-wide (76 mm) polyethylene tape at each joint.

**3.2.4 Tee Fitting:** Tee fittings are used to join one run or branch of AKWADRAIN™ to another at a 90-degree angle. A minimum 3-inch-wide (76 mm) polyethylene tape is used to secure each joint.

**3.2.5 Outlet Fitting:** The Outlet Fitting is a black plastic fitting used to connect AKWADRAIN™ to the drainage piping, using a minimum 3-inch-wide (76 mm) polyethylene tape at the joint.

**3.2.6 Corner Fitting:** The Corner Fitting is a black plastic fitting used to connect AKWADRAIN™ sections around an inside or outside corner at a 90-degree angle. A minimum 3-inch-wide (76 mm) polyethylene tape is used to secure each joint.

**3.2.7 Corner Guard Fitting:** The Corner Guard is a black plastic fitting with polypropylene nonwoven geotextile bonded to plastic. The fitting is used as an alternative to the corner fitting to allow the bending of AKWADRAIN™ around an inside or outside corner at a 90-degree angle. A minimum 3-inch-wide (76 mm) polyethylene tape is used to secure each joint.

**3.2.8 Step Down Fitting:** The Step Down Fitting is a black plastic fitting used with AKWADRAIN™ to facilitate changing


ES REPORTS™ are not to be construed as representing aesthetics or any other attributes not specifically addressed, nor are they to be construed as an endorsement of the subject of the report or a recommendation for its use. There is no warranty by ICC Evaluation Service, Inc., express or implied, as to any finding or other matter in this report, or as to any product covered by the report.





EXHIBIT

C-3



**LEGACY REPORT**

NER-480

*Reissued June 1, 2006*

**ICC Evaluation Service, Inc.**
www.icc-es.org

Business/Regional Office ▪ 5360 Workman Mill Road, Whittier, California 90601 ▪ (562) 699-0543
Regional Office ▪ 900 Montclair Road, Suite A, Birmingham, Alabama 35213 ▪ (205) 599-9800
Regional Office ▪ 4051 West Flossmoor Road, Country Club Hills, Illinois 60478 ▪ (708) 799-2305

Legacy report on the 2000 *International Building Code®*, the 2000 *International-Residential Code®*, the BOCA® *National Building Code/*1999, the 1999 *Standard Building Code®* and the 1997 *Uniform Building Code™*

DIVISION: 07—THERMAL AND MOISTURE PROTECTION
Section: 07140—Fluid-Applied Waterproofing

TREMCO BARRIER SOLUTIONS, INC.
6402 EAST MAIN STREET, SUITE 201
REYNOLDSBURG, OH 43068
www.GuaranteedDryBasements.com

**1.0    SUBJECT**

Tremco Barrier Solutions Tuff-N-Dri® Exterior Foundation Waterproofing Membrane.

**2.0    PROPERTY FOR WHICH EVALUATION IS SOUGHT**

Foundation Waterproofing Material

**3.0    DESCRIPTION**

Tremco Barrier Solutions, Inc. Tuff-N-Dri waterproofing membrane is a spray-applied foundation waterproofing material composed of polymer-modified asphalt in a water carrier that cures to a monolithic, elastomeric membrane.

Tuff-N-Dri is a spray-applied waterproofing that is installed to a thickness of 63 mils (40 mils dry) on the exterior of below-grade foundation walls. The material is available in 55-gallon drums, having a density of 8.1 pounds per gallon. Storage shall be above 50°F. Shelf life is a maximum of 12 months.

**4.0    INSTALLATION**

Tuff-N-Dri is designed for use on exterior, below-grade, foundation walls. It is applied only by a Tremco Barrier Solutions, Inc. selected waterproofing contractor to ensure proper installation. The installation shall conform to the manufacturer's instructions, revised April 2000, and this report. A primer material is not required prior to application of the material, and immediate backfill pressure, after application, is not necessary.

Substrates shall be clean, smooth, firm, free of dust, mud, loose mortar, wires and any other substances that might prevent proper placement and bonding. Wall ties shall be removed and mortar joints shall be flush. Cracks, voids and holes shall be patched with a nonshrinking grout or asphalt mastic, with nonshrinking grout preferred for large defects.

Tuff-N-Dri shall only be applied when heated to between 140°F and 160°F and when the air temperature is at least 20°F. The time needed for the coating to cure before backfilling is 16 to 24 hours; lower air temperatures require a longer curing time. Application rate of the material is dependent upon the foundation wall surface; for cast in place or precast concrete and parged concrete masonry units, the rate shall be 25 sq. ft./gal. and for concrete masonry units, 20 sq. ft./gal. Tuff-N-Dri is permitted to be applied to concrete foundations as soon as the forms are removed and to concrete masonry unit foundations when the mortar has cured.

Concrete and masonry shall not be frozen. After application, Tuff-N-Dri is limited to no more than 15 days exposure to sunlight prior to backfilling.

**5.0    IDENTIFICATION**

Each container shall bear the manufacturer's name, address, and product name and the NES evaluation report number.

**6.0    EVIDENCE SUBMITTED**

6.1    Tremco Barrier Solutions, Inc. Tuff-N-Dri® Waterproofing Membrane Detailed Application Instructions, revised April 2000.

6.2    Report of tests on Tuff-N-Dri® by DL Laboratories, Report No. DL-8980-R, dated July 13, 1992:

- Film thickness
- Tensile strength and elongation
- Durability
- Water-vapor transmission
- Water solubility
- Adhesion in peel
- Hydrostatic pressure
- Low-temperature flexibility
- Crack bridging

6.3    Data on DL Laboratories, dated December 30, 1992.

6.4    Letters, dated November 23, 1992 and January 18, 1993.

*ICC-ES legacy reports are not to be construed as representing aesthetics or any other attributes not specifically addressed, nor are they to be construed as an endorsement of the subject of the report or a recommendation for its use. There is no warranty by ICC Evaluation Service, Inc., express or implied, as to any finding or other matter in this report, or as to any product covered by the report.*





**EXHIBIT**

C-4

22-13



# LEGACY REPORT

*Reissued November 1, 2007*

**ICC Evaluation Service, Inc.**
www.icc-es.org

Business/Regional Office ⊠ 5360 Workman Mill Road, Whittier, California 90601 ⊠ (562) 699-0543
Regional Office ⊠ 900 Montclair Road, Suite A, Birmingham, Alabama 35213 ⊠ (205) 599-9800
Regional Office ⊠ 4051 West Flossmoor Road, Country Club Hills, Illinois 60478 ⊠ (708) 799-230

Legacy report on the BOCA® *National Building Code*/1999

DIVISION: 07—THERMAL AND MOISTURE PROTECTION
Section: 07140—Fluid-Applied Waterproofing

**REPORT HOLDER:**

TREMCO BARRIER SOLUTIONS, INC.
6402 EAST MAIN STREET
SUITE 201
REYNOLDSBURG, OHIO 43068
(800) 876-5624
www.GuaranteedDryBasements.com

**EVALUATION SUBJECT:**

WATCHDOG WATERPROOFING AND
TUFF-N-DRI® WATERPROOFING

**EVALUATION SCOPE**

Compliance with the following code:

BOCA® *National Building Code*/1999

■ Section 1813.4.2.2 Wall waterproofing materials

**DESCRIPTION**

Watchdog Waterproofing and Tuff-N-Dri® Waterproofing are fluid-applied, one-coat, polymer-modified asphalt waterproofing membranes. The waterproofings are intended for spray application to below-grade foundation walls and footings of concrete and unparged or parged concrete masonry unit construction.

**CONDITIONS OF USE**

This report is limited to the applications and products as stated in this report. The ICC-ES Subcommittee on National Codes intends that the report be used by the code official to determine that the report subject complies with the code requirements specifically addressed, provided that this product is installed in accordance with the following conditions:

■ Watchdog Waterproofing and Tuff-N-Dri membranes shall be limited to applications on the exterior vertical surfaces of below-grade foundation walls of unparged or parged concrete masonry, concrete construction and to vertical surfaces of supporting footings.

■ Surfaces of the foundation walls and footings to be waterproofed shall be clean, dry and free of mortar, sand, soil, water, frost or other loose materials. The surfaces shall be smooth and free of projections including form ties. Concrete, unparged or parged masonry surfaces shall be cured and dry prior to application of the liquid waterproofing membrane.

■ Voids in concrete, tie holes and honeycombed areas in the foundation wall or footings shall be filled with non-shrinking grout or an asphalt based mastic. Where non-shrinking grout is used for filling voids, adequate time shall be allowed for the grout to cure before proceeding with the membrane application.

■ The liquid membrane shall be spray applied. The ambient air temperature at the time of application shall be 20 degrees F (-6 degrees C) or greater. Application temperature of the liquid material shall be in accordance with the manufacturer's published installation instructions.

■ Backfilling shall not begin sooner than 24 hours after membrane application.

■ This report is limited to an evaluation of Watchdog Waterproofing and Tuff-N-Dri membranes applied at a minimum wet thickness of 0.060-inch (1.52 mm) (60 mils), which cures to a minimum dry film thickness of 0.040-inch (1.02 mm) (40 mils).

■ Application of the Watchdog Waterproofing and Tuff-N-Dri membranes on uncured ("green") concrete is outside the scope of this report.

■ This report is subject to periodic re-examination. For information on the current status of this report, contact the ICC-ES.

**ITEMS REQUIRING VERIFICATION**

The following items are related to the use of the report subject, but not within the scope of this evaluation. However, these items are related to the determination of code compliance:

✓ Walls and footings shall be designed and constructed in accordance with Sections 1810.0 and 1813.4.2 of the BOCA® *National Building Code*/1999.

✓ Placement of backfill, site grading and erosion control shall be in accordance with the requirements of Sections 1813.6, 1813.7 and 1813.8 of the BOCA® *National Building Code*/1999.

✓ Detailing of joints and penetrations in the foundation wall is in accordance with Section 1813.4.3 of the BOCA® *National Building Code*/1999.

**INFORMATION SUBMITTED**

■ Tremco Barrier Solutions, Inc. Tuff-N-Dri® Waterproofing Membrane Detailed Application Insutructions, revised April 2000.

*ICC-ES legacy reports are not to be construed as representing aesthetics or any other attributes not specifically addressed, nor are they to be construed as an endorsement of the subject of the report or a recommendation for its use. There is no warranty by ICC Evaluation Service, Inc., express or implied, as to any finding or other matter in this report, or as to any product covered by the report.*

Copyright © 2007



**EXHIBIT D**

CEMENT AND
WATERPROOFING
7855 Russellhurst Dr.
Kirtland Oh, 44094
440-479-5575

On December 28, 2018 Ms. Andrea Bryner @ 496 Cebarberry Ct. Painesville, Ohio 44077 contacted us in regards to having storm water leaking into her basement. At this time, I John Levkulich with L.J.I.Cement & Waterproofing televised/camera the pipes that are tied into the sump pit. During inspection I found iron deposits and sediment at the point of exterior making it impassable to enter the exterior drainage system. I also noticed a very large amount of vertical cracks in the foundation along with moisture along the areas near the cracks and bottom of the walls near the concrete floor. At this time, to Andrea Bryner I recommended an excavation at the closest allowable spot to the sump pit without disturbing the patio or deck. On January 9, 2019 we excavated a section of foundation on the left rear corner of house (facing house).

We found,
- No form of drain at this location as stated by builder.
- No piping of the footer drains.
- Inferior foundation coating, thinned out and transparent.
- No #57 wash stone or limestone for drainage.
- No Clean outs (because of no footer drains to tie into).

The foundation waterproofing and storm drainage system was not used as per the plans of the approved architectural drawings, The Ohio Building Code, Ohio Plumbing Code, International Building Code, and The Uniform Building Code.

In review of the findings, and The Ohio Building Code, Ohio Plumbing Code, International Building Code, and The Uniform Building Code. The complete exterior of the house will have to be excavated and properly waterproofed. We will submit an estimate.

Sincerely,



**L.J.I.**
CEMENT & WATERPROOFING, LLC

CEMENT • WATERPROOFING • SNOWPLOWING
AND MORE . . .

FULLY INSURED • LICENSED & BONDED

JOHN LEVKULICH
7855 RUSSELLHURST • KIRTLAND, OHIO 44094
LEVKULICHJ@AOL.COM • 440.479.5575

## PROPOSAL SUBMITTED TO

NAME  Andrea Bryner
ADDRESS  496 Cedarberry Ct
CITY  Painesville  STATE  Ohio  ZIP  44077
TELEPHONE  440-339-1557

## WORK TO BE PERFORMED AT

NAME  Bryner Residence
ADDRESS  496 Cedarberry Ct
CITY  Painesville  STATE  Ohio  ZIP  44077
EMAIL – Andreamy3Son's@yahoo.com

| DATE | DATE OF PLANS | START WORK DATE | YOUR INQUIRY NO. | PROPOSAL NO. | PAGE NO. | OF |
|------|---------------|-----------------|------------------|--------------|----------|----|
| 3-2-19 | | To be Scheduled | | | | |

Install Drainage System Around Perimeter of Home along Footer.
– Excavate – haul waste dirt away – Install New Schedule 35 PVC 4" PVC
perforated Footer drains – Install Clean outs on Every wall
– Bed Footer drains on # 57 wash gravel – Power wash wall – grind out
creeks – Fill with hydraulic cement – Tar wall – back fill 1' (Frost) From
grade – Install Felt barrier then Topsoil – ~ 28,500.⁰⁰
– Demo Deck & Pavers – (Save Pavers & Reset) – $ 14,300.⁰⁰
Rebuild Deck –
Clean up Job site – Seed – n – Straw –
Permits Included –

**PROPOSAL INCLUDES** MATERIAL AND LABOR AS REQUIRED IN ACCORDANCE WITH THE ABOVE SPECIFICATIONS

FOR THE SUM OF  Amounts Stated  DOLLARS  42,800.⁰⁰

PAYMENT TO BE MADE AS FOLLOWS  To be discussed

All material is guaranteed to be as specified. All work to be completed in a workmanlike manner according to standard practices. Any alteration or deviation from above specifications involving extra costs, will be executed only upon written orders, and will become extra charge over and above the estimate. All agreements contingent upon: strikes, accidents or delays beyond our control. owner to carry fire, tornado and other necessary insurance. Our workers are fully covered by Workman's Compensation Insurance.

NOTE:  THIS PROPOSAL MAY BE WITHDRAWN BY US IF NOT ACCEPTED WITHIN  120  DAYS

AUTHORIZED SIGNATURE  John Levkulich

## ACCEPTANCE OF PROPOSAL

THE ABOVE PRICES, SPECIFICATIONS AND CONDITIONS ARE SATISFACTORY AND ARE HEREBY ACCEPTED. YOU ARE AUTHORIZED TO COMPLETE THIS CONTRACT AS SPECIFIED PAYMENT WILL BE MADE AS OUTLINED ABOVE.

SIGNATURE OR COMPANY _____  DATE: _____

AUTHORIZED SIGNATURE  X _____

DATE OF ACCEPTANCE  X _____

## INSTRUCTIONS FOR SERVICE

**TO THE CLERK:**

Please issue a time-stamped copy of Complaint to the following individuals by certified mail, return receipt requested:

NVR, INC.
d/b/a Ryan Homes
c/o Corporation Service Company
50 West Broad Street, Suite 1330
Columbus, Ohio 43215

CORPORATION SERVICE COMPANY
100 Shockoe Slip, 2nd Floor
Richmond, VA 23219

_____
Brian A. Muenchenbach

15

3343828.3